STATE of Missouri, Respondent,

v.

Darrell J. MEASE, Appellant.

No. 72846.

Supreme Court of Missouri, En Banc.

Nov. 24, 1992.

Rehearing Denied Dec. 18, 1992.

---

100 █ 

Craig A. Johnston, Columbia, for appellant.

William L. Webster, Atty. Gen., Breck K. Burgess, Asst. Atty. Gen., Jefferson City, for respondent.

HOLSTEIN, Judge.

On May 15, 1988, the bullet-riddled bodies of Lloyd Lawrence, his wife, Frankie Lawrence, and their grandson, William (Willie) Lawrence, a nineteen-year-old paraplegic, were found on the Lawrence property in rural Taney County. On March 16, 1989, a six-count information was filed charging defendant Darrell J. Mease with three counts of first degree murder, § 565.-020,[1] and three counts of armed criminal action, § 571.015, all arising out of the homicides of the Lawrences. A change of venue was taken to Greene County. The count charging defendant with murder of Willie Lawrence was severed and tried separately. A jury found defendant guilty and assessed the death penalty. The trial judge sentenced defendant to death. A Rule 29.15 motion was filed, heard and overruled. The appeals were consolidated. *Rule 29.15(l)*. Because defendant was sentenced to death, this Court has jurisdiction. *Mo. Const. art. V, § 3*. The judgments are affirmed.

---

1. All references to statutes are to RSMo 1986 unless specified otherwise.

On direct appeal defendant claims error in (1) admission of his confession, (2) the admission of the testimony of Mary Epps, (3) the admission of photographs and a videotape of the victims, (4) improper argument by the prosecutor, (5) failure to admit evidence of "reverse victim impact" showing Lloyd Lawrence had allegedly raped his daughters, and (6) six allegations of error in giving or failing to give jury instructions. In the appeal from the post-conviction motion defendant asserts four claims of ineffective assistance of counsel.

## FACTS

Defendant gave a confession. In addition, his girlfriend, Mary Epps, testified against defendant. The facts recited below are taken largely from these two sources.

Defendant and Lloyd Lawrence became acquainted in 1987 when defendant was employed to do carpentry and farm work on the Lawrence property in rural Taney County. During their acquaintance, Lawrence and defendant became involved in a scheme to manufacture methamphetamine, also known as "crank." Defendant was a user of the drug when it was available. Lawrence apparently knew the formula and the process for making methamphetamine. He was to share this knowledge with defendant.

By late 1987, defendant had not been taught the trade, and the relationship became strained. The breaking point came when Lawrence gave defendant some unusual looking pink-colored crank. After defendant had ingested the drug he became very sick. This episode caused defendant to believe that Lawrence intended to harm him. Due to his belief that "things were getting pretty dangerous," defendant and his girlfriend left the Taney County area in late December of 1987. But before leaving Missouri, defendant took four pounds of crank and four bottles of a chemical used in the manufacturing process, all belonging to Lloyd Lawrence, placed them in a backpack, and hid them near Reeds Spring, Missouri.

From Missouri, defendant and Epps travelled to Palmdale, California, pawning items along the way to support themselves. After reaching California, they spent a week or two with relatives. Defendant and Epps then went to Lone Pine, California. In February of 1988, defendant received about $12,000 cash, the net proceeds of a loan defendant obtained by mortgaging a house he owned in Palmdale. Because defendant had no identification, a car was purchased in Epps' name, and the two left California for Arizona.

In Phoenix, Epps purchased a Bennelli .12–gauge shotgun for defendant, again due to defendant's lack of identification. In March, Epps was contacted by police in Cottonwood, Arizona. They indicated her mother wanted her to call home. When she telephoned, Epps' mother said that Lloyd Lawrence was looking for defendant and intended to kill him.

Between late March and early May of 1988, defendant and Epps began a somewhat circuitous trip back toward Missouri, living in a camper and making several stops along the way. In late March, defendant bought an H & K Model 91, .308 assault rifle in Alexandria, Louisiana. Shortly after the gun was purchased, defendant stated he "needed to settle things with Lloyd, or we'd be running all our life."

In early May, Epps and defendant stayed in Arkansas for a time. Finally the two camped near Chadwick, Missouri, on May 9 or 10, 1988. Defendant went to Reeds Spring and retrieved the drugs from where they were hidden. He brought them back to the Chadwick campsite and buried them. While staying at the Chadwick campground, defendant told Epps that if Lawrence was staying at the cabin in rural Taney County that weekend, defendant "was going to have to kill him."

On the evening of May 13, 1988, Epps drove defendant to a location on a county road just inside Taney County, a short distance from where U.S. Highway 65 crosses Bear Creek. She was instructed to check back each of the next two days to see if some orange-colored ribbon had been tied to the trees underneath the U.S. Highway 65 bridge that crosses Bear Creek. If she observed the ribbon, she was to drive north

on Highway 65 a short distance and he would be waiting for her there. When Epps dropped defendant off he was wearing camouflage clothing, had camouflage paint on his face, was carrying a backpack, and was armed with knives, a .357 Smith & Wesson pistol, the .12–gauge Bennelli shotgun, and the H & K .308 rifle. Defendant's ammunition included both double-aught buckshot and slug ammunition for the shotgun.

On the first night, defendant went to the house of Rocky Redford, near the Lawrence property, to "settle a score." Redford was not home, so defendant spent the night in a barn. The next morning, he went to a hillside from which he could observe the Lawrence property. From his vantage point, he observed a cream-colored pickup truck arrive and remain for some period of time. Defendant assumed the driver of the pickup was a lookout for Lloyd Lawrence. At some point during the day, Lloyd Lawrence spoke to the driver, and the truck left.

Later, defendant began to approach the cabin, at one point getting close enough to hear a radio inside. However, defendant startled some birds. Out of concern that Lloyd or Lloyd's dogs would be alerted, he withdrew to a point near a creek on the same property, where he spent the night.

Early in the morning of May 15, defendant constructed a blind of cut tree branches and placed them in a semicircle near a large tree, about fifteen feet from a road leading from the Lawrence cabin to where the road forded a small creek. Defendant hid in this blind for several hours.

At about noon, the Lawrences approached defendant's position, riding four-wheeled all-terrain vehicles. Willie was driving fast and was the first to pass defendant's position. Because Willie was paralyzed due to a 1986 car accident, his feet were tied to the handlebars by the shoe laces to keep them on the vehicle. Some distance behind and driving slower were Lloyd and Frankie, both riding on one vehicle. As Lloyd came even with defendant's location, defendant shot Lloyd, then Frankie, then Lloyd again using the shot-

gun, loaded alternately with buckshot and slugs. Their vehicle went forward slowly and came to a stop in the creek. At that point, defendant came out of the woods.

By that time, Willie had turned around and was returning toward the scene. It was then that defendant shot Willie. Using the Bennelli .12–gauge shotgun, still alternately loaded with double-aught buckshot and slugs, defendant then shot each of the three victims in the head at point blank range. Defendant took Lloyd's wallet, a watch, and two rings. Six hundred dollars was removed from the wallet, and the wallet was hidden under a log.

At the prearranged location, defendant was picked up by Epps. The two first fled to Illinois, then to Colorado, Nevada, and eventually to Arizona, where they pawned the guns in Phoenix. They stayed there through the remainder of 1988. By that time, they were beginning to run out of the money which defendant had obtained from the loan on his home in California.

In January, 1989, defendant was arrested in Arizona on two felony warrants issued on nonsupport charges in Stone County on May 19, 1988. In addition, a Taney County arrest warrant for unlawful use of weapons had been issued on June 16, 1988, and was outstanding. Defendant was returned to Missouri where he gave a confession and was charged with the homicides.

I.

Defendant attacks the admission of his confession in evidence on two grounds. First, he claims the statements were obtained as a result of a pretextual arrest. Second, he argues that the statements were elicited after defendant had requested counsel. He claims that as a result, the statements should be excluded because of a violation of his rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution and similar provisions in the Missouri Constitution.

A.

▌ Incident to both issues, defendant makes the argument that the trial court's

order failed to recite that the confession was a knowing and intelligent relinquishment of a known right or privilege, relying on *State v. Bittick*, 806 S.W.2d 652 (Mo. banc 1991). The order overruling the motion to suppress stated, "Court finds beyond reasonable doubt that defendant was lawfully arrested; that he was properly advised of his rights; that his statements were given freely and voluntarily; and that they were not the result of force, threats or promises."

This Court recently rejected the argument that *Bittick* requires the precise words "knowing and intelligent waiver" in a trial court's ruling denying a motion to suppress in order for the ruling to be sustained on appeal. *State v. Schnick*, 819 S.W.2d 330, 336 (Mo. banc 1991). In *Bittick*, a genuine question was raised as to whether the waiver of rights was both a knowing and a voluntary waiver. That is not the case here.

In this case, the motion to suppress made no allegation that defendant made an unknowing or unintelligent waiver of counsel prior to confessing. No evidence was produced showing defendant suffered from any physical, mental, or intellectual disability that would render his waiver unknowing or unintelligent. The motion for new trial is likewise silent on these questions. Because defendant failed to raise the issue before the trial court and failed to preserve it in this appeal, the issue is gratuitously reviewed for the purpose of determining if there is plain error. Absent any allegation or evidence indicating that the defendant lacked sufficient knowledge or intelligence to make a waiver of his right to counsel, there is no plain error in failing to make a specific finding on the question incident to overruling a motion to suppress. *See State v. Lytle*, 715 S.W.2d 910, 917 (Mo. banc 1986).

### B.

Defendant argues that the issuance of the warrants on May 19, 1988, for nonsupport from Stone County and the June 16, 1988, warrant for carrying a concealed weapon were issued for the ulterior motive of questioning defendant regarding the homicides and, thus, the resulting arrest was pretextual.

The evidence on the question of pretextual arrest includes the testimony of the Stone County prosecutor. When the prosecutor learned in May of 1988 that Mease had moved out of his home and left the state of Missouri, he filed the felony nonsupport complaints, which resulted in the warrants being issued. The prosecutor had also "heard rumors" that perhaps defendant was connected to the Lawrence homicides. Also, Alan Mason, the investigator for the Taney County prosecutor's office, testified that during the course of the homicide investigation, he learned defendant had violated the terms of a deferred prosecution agreement on the weapons charge. Because of the violation of the agreement and because he "wanted to talk to Darrell Mease" regarding the homicides, he had requested that that warrant be issued in Taney County.

Evidence procured as a result of a pretextual arrest is inadmissible because it is obtained as a result of an arrest made invalid under the Fourth Amendment of the United States Constitution. *State v. Dulany*, 781 S.W.2d 52, 57 (Mo. banc 1989). However, the Fourth Amendment analysis of the validity of an arrest involves "an objective assessment of the officer's actions in light of the facts and circumstances confronting him at that time." *Maryland v. Macon*, 472 U.S. 463, 105 S.Ct. 2778, 86 L.Ed.2d 370 (1985), quoting *Scott v. United States*, 436 U.S. 128, 137, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978). Consistent with that approach, two cases decided by the Missouri Court of Appeals have held that an officer's subjective motivation for making an arrest is immaterial where the police conduct, assessed objectively, falls within the requirements of the Fourth Amendment. *State v. Smith*, 812 S.W.2d 225, 227 (Mo.App.1991); *State v. Craig*, 759 S.W.2d 377, 381 (Mo.App.1988). Most state and federal courts have adopted the view that so long as the police do no more than they are objectively authorized and legally permitted to do, an officer's

motives in making an arrest are irrelevant and not subject to inquiry. *United States v. Cummins*, 920 F.2d 498, 501 (8th Cir. 1990); *United States v. Trigg*, 878 F.2d 1037, 1041 (7th Cir.1989); *United States v. Causey*, 834 F.2d 1179 (5th Cir.1987); *United States v. Hawkins*, 811 F.2d 210 (3rd Cir.), *cert. denied*, 484 U.S. 833, 108 S.Ct. 110, 98 L.Ed.2d 69 (1987); *State v. Jeney*, 163 Ariz. 293, 296, 787 P.2d 1089, 1092 (1990), and cases cited therein.

Nevertheless, there are two cases of this Court seeming to hold that it is appropriate to make a subjective inquiry into the officer's motives in making an arrest, even though the arrest is an objectively lawful arrest, *State v. Blair*, 691 S.W.2d 259 (Mo. banc 1985), and *State v. Moody*, 443 S.W.2d 802 (Mo.1969). These cases both involve traffic arrests, and it is questionable whether they apply to cases where the arrest was for some offense other than a traffic offense. Nevertheless, they suggest that even though an arrest is objectively valid, the court may inquire into a police officer's subjective intent in determining whether evidence obtained as a result of the arrest is admissible. These cases are at odds with the objective analysis required of Fourth Amendment claims that has been adopted by the United States Supreme Court in *Scott v. United States, supra, Macon v. Maryland, supra,* and *United States v. Villamonte-Marquez,* 462 U.S. 579, 584 n. 3, 103 S.Ct. 2573, 2577 n. 3, 77 L.Ed.2d 22 (1983), and in most other jurisdictions.

The majority view makes much sense. It is certainly incongruous to say that police may make a valid arrest of any person under the authority of a lawful arrest warrant, but if police are also motivated by a desire to question the person regarding an unrelated offense, the arrest is invalid. To the extent that *Blair* and *Moody* are inconsistent with this opinion, they are overruled.

■ The warrants in this case were based upon probable cause and were otherwise valid. The officers making the arrest in Arizona were acting in good faith reliance on the Missouri warrants when the defendant was arrested. Neither the Stone County prosecutor's nor Mason's subjective motivation may be considered in determining the validity of the arrest warrants. Objectively viewed, the arrest of defendant in Arizona was not pretextual.

Defendant also relies on *United States v. Prim*, 698 F.2d 972 (9th Cir.1983), where all officers involved testified that although they were aware of a nonsupport warrant issued by the state of Oregon, the only basis for stopping defendant at the Honolulu, Hawaii, airport was because they suspected him of trafficking in drugs and not because of the outstanding warrant. 698 F.2d at 975. The *Prim* court used an objective standard and found that the sole basis of the arrest was objectively determined to be something other than the nonsupport warrant. On that basis, *Prim* is distinguishable.

## C.

■ Missouri Highway Patrol investigators Jack Merritt and Taney County prosecutor's office investigator Alan Mason went to Phoenix to question defendant about the homicides. After reading defendant his rights, defendant stated he wished to speak with an attorney. The officers immediately terminated the conversation. Epps was interviewed and gave the officers permission to search the vehicle the couple had been driving.

Defendant waived extradition on the weapons charge and was flown back to Missouri on January 13, 1989. Defendant claims to have seen Merritt writing reports during the flight. He deduced from what he saw that Epps had given information regarding the homicides.

After arriving at the Springfield, Missouri, airport, defendant was transported to Taney County by Highway Patrol Sergeants Lee Stephens and Wayne Murphy. During the ride, Stephens asked defendant if he had employed an attorney. He replied, "No, but I guess I'll have to." Stephens then asked if defendant had made a statement, to which defendant replied, "No, I'm going to sleep on it, then I may."

Defendant was taken before a Taney County judge and arraigned on the murder, armed criminal action and weapons charges and informed of his rights, including the right to counsel. Sergeants Stephens and Murphy then transported defendant to the Highway Patrol headquarters in Springfield for further processing and fingerprinting prior to being placed in the Greene County jail to await trial. At a stoplight, just before reaching the patrol headquarters, defendant volunteered, "The only thing I hate about this is Willie." Stephens asked, "Why Willie?" Defendant replied, "Willie would have recognized me and I had to do him, too." Sergeant Stephens then asked if defendant wanted to make a statement. Defendant answered in the affirmative and stated that he only wanted Sergeants Merritt and Stephens present and did not want any Taney or Stone County officials there.

On arrival at the patrol headquarters, defendant was taken to a room where Merritt and Mason were located. Mason was asked to leave, and he complied. With Merritt and Stephens in the room, defendant was informed of his *Miranda* rights, waived those rights, and was interviewed about the homicides. After about an hour, a videotape recording camera was set up and the interview continued. In the videotaped interview, defendant was advised of his constitutional rights, which he stated he understood. He then signed a written waiver of those rights and gave a statement confessing to having killed the Lawrences.

■ As a general principle, once counsel is requested, police officers may not interrogate an accused person further until a lawyer has been provided. *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981). However, where the accused initiates further communications or conversations with police, no violation of the general principle occurs. *Minnick v. Mississippi*, 498 U.S. 146, ——, 111 S.Ct. 486, 492, 112 L.Ed.2d 489 (1990); *Stumes v. Solem*, 752 F.2d 317, 322 (8th Cir.), *cert. denied*, 471 U.S. 1067, 105 S.Ct. 2145, 85 L.Ed.2d 502 (1985);

*State v. Bittick*, 806 S.W.2d 652, 655 (Mo. banc 1991); *State v. Owens*, 827 S.W.2d 226, 227 (Mo.App.1991). Specifically, when an accused has requested counsel but thereafter opens a dialogue with police officers regarding an offense under investigation, and the accused is thereafter advised of his *Miranda* rights and makes a valid waiver of those rights, the accused's statements are admissible. *Oregon v. Bradshaw*, 462 U.S. 1039, 1045–46, 103 S.Ct. 2830, 2834–35, 77 L.Ed.2d 405 (1983). Here, defendant initiated the discussion by his spontaneous comments regarding Willie's death. There was no violation of defendant's right to counsel under the Fifth or Fourteenth Amendments to the United States Constitution or similar provisions of Mo. Const. art. I, §§ 10 and 18(a).

■ A somewhat different analysis is applicable to defendant's claim of a violation of his Sixth Amendment right to counsel. The Sixth Amendment right to counsel, as well as the Missouri Constitution article I, § 18(a) right to counsel, does not attach until a prosecution is commenced by the filing of formal charges regarding a specific offense. *McNeil v. Wisconsin*, —— U.S. ——, ——, 111 S.Ct. 2204, 2207, 115 L.Ed.2d 158 (1991). Here, defendant was taken before a judge and informed of the homicide charges and his right to counsel regarding those charges. Because nothing in the record suggests that defendant invoked his Sixth Amendment and Missouri Constitution article I, § 18(a) right to counsel, no violation of those rights occurred. The trial court did not err in overruling the motion to suppress defendant's confession.

### II.

■ Defendant moved to suppress Mary Epps' testimony on the basis that he had been denied meaningful pretrial discovery of her testimony. Just after defendant was arrested, Epps was also arrested in Arizona. While in custody in the Maricopa County jail, she gave a statement to police. However, when she returned to Missouri, she employed a lawyer who advised her not to make further statements. As a result, she exercised her Fifth Amendment right

and refused to testify when called by defendant during a hearing on September 6, 1989, and again at a pretrial deposition. Thereafter, Epps signed an agreement with the prosecutor that she would be granted immunity from prosecution if she would testify. The prosecutor notified defense counsel of the agreement by telephone and on April 9, 1990, delivered a written disclosure of the agreement. The following week, the prosecutor talked to an employee of the defense counsel and again confirmed the agreement with Epps and told the employee that Epps would be made available for a deposition. Defense counsel did not attempt to conduct any deposition. Trial commenced on April 23, 1990. Prior to trial, defense counsel was permitted to interview Epps out of the hearing of the prosecutor and other law enforcement officials. The interview lasted only a few minutes.

In *State v. Wilkinson*, 606 S.W.2d 632 (Mo. banc 1980), a defendant was denied a pretrial deposition of the state's principal witness because the witness had exercised his Fifth Amendment right to remain silent. Because the defendant's right to meaningful pretrial discovery was frustrated, this Court held that the trial court should have granted "appropriate remedial action" and reversed the conviction. 606 S.W.2d at 638.

■ The purpose of discovery is to permit defendant a decent opportunity to prepare in advance for trial and avoid surprise. Thus, the focus of a denial of discovery is whether there is a reasonable likelihood that denial of discovery affected the result of the trial. *State v. Kilgore*, 771 S.W.2d 57, 66 (Mo. banc 1989). The standard for reviewing a claim that defendant was denied meaningful discovery is whether the trial court abused its discretion in such a way as to result in fundamental unfairness. *State v. Royal*, 610 S.W.2d 946, 951 (Mo. banc 1981).

Here, the defendant was aware of the content of Epps' statement given more than a year prior to trial. Her testimony at trial was not shown to be different from her pretrial statement. As soon as the

state obtained Epps' agreement to testify, the prosecutor informed defense counsel of his intent to use her testimony and offered to permit her deposition to be taken. Counsel was permitted to interview the witness out of the presence of law enforcement personnel prior to trial. No explanation is given as to why defense counsel did not take steps to try to obtain the deposition. No other remedy, such as a continuance or a recess to obtain the deposition, was sought. Under the circumstances, the defendant had sufficient opportunity to know in advance what Epps' testimony would be. Nothing in the record suggests that the pretrial deposition would have affected the result. The claim that defendant was denied meaningful pretrial discovery is without merit.

### III.

■ Among the exhibits offered in evidence during the guilt phase were photographs of the three victims taken while living, a single photograph of the three victims and the all-terrain vehicles as they were found after the shooting, and a photograph depicting a trail of blood leading along the road up to the edge of the creek where the vehicles came to a stop. In the punishment phase, photographs of Willie and Lloyd Lawrence were admitted showing that each suffered a massive head wound. In addition, a videotape was admitted showing the scene of the homicides from various locations, including a depiction of the victims and their injuries. Defendant objected to the photographs and videotape as unduly inflammatory.

■ Trial courts have broad discretion in the admission of photographs. Even though gruesome, they may be admitted to show the nature and location of wounds, depict the location and condition of the body, or to establish any other element of the state's case. *State v. Feltrop*, 803 S.W.2d 1, 11 (Mo. banc 1991). In this case, the photographs presented during the guilt phase corroborated the confession of defendant regarding the facts of the homicide, as well as the testimony of the witnesses who found the bodies. The photographs

also assisted in explaining the testimony of the pathologist who examined the bodies. In the penalty phase the videotape helped explain the relative location of various objects described in the trial testimony. In addition, the photographs and videotape in the penalty phase were highly relevant in demonstrating that the murder of Willie Lawrence occurred while defendant was engaged in committing other unlawful homicides and that the murder of Willie was "outrageously and wantonly vile, horrible and inhuman." The photographs and the videotape were relevant to the issues presented in this case, and thus there was no abuse of discretion in admitting them.

## IV.

In closing argument during the guilt phase, defense counsel asserted that by placing the photographs of Willie in evidence, the prosecutor had "insulted [the jurors'] intelligence." Defense counsel concluded by saying, "I'm ashamed of this prosecutor" for using Willie's photographs. During the penalty phase argument, the prosecutor responded by arguing "[T]he defense had the audacity to argue that there is something improper about focusing on Willie Lawrence ... [i]f any shame is to be called, it is shame on the defense for resorting to these shoddy tactics ... The defense has played loose and free with the truth all week."

The prosecutor also argued during the penalty phase that it was "not an easy decision for a prosecutor to" ask for the death penalty. He later stated, "[t]hat photograph, that videotape better than any words can show you why ... these two prosecutors and the state of Missouri can stand up here and look you square in the eye and say this man deserves to die."

Defendant makes objections to the closing argument for the first time on appeal. Because nothing was raised before the trial court, review is limited to whether the argument amounts to plain error.

 The first attack on the argument is that the prosecutor's argument included "personal vouching" that the defendant deserved the death penalty. A review of that portion of the argument reveals that the prosecutor was merely expressing his opinion fairly drawn from the evidence before the jury that the death penalty was appropriate. Such argument is permissible. *Grubbs v. State,* 760 S.W.2d 115, 119 (Mo. banc 1988). The argument that "it's not an easy decision" to ask for the death penalty, "[b]ut we make it in this case" does not imply that the prosecutor had any facts that were not before the jury for their consideration. In this regard there is no error, plain or otherwise.

 The second aspect of the argument suggests that the prosecutor improperly made a personal attack on defense counsel. As previously noted, the argument of the prosecutor saying "shame on the defense" was provoked by defense counsel and was made by way of retaliation. Considerably more leeway is granted when argument is retaliatory. *State v. Walls,* 744 S.W.2d 791, 797 (Mo. banc 1988). There was no error arising from that aspect of the argument and certainly no manifest injustice.

 During closing argument in the penalty phase, the prosecutor stated, "The entire thrust of the defendant's case has been a ploy for mercy, for sympathy ... But you swore to try the case on justice." Defendant claims the state misled the jury on the law by implying that the jury could not as a matter of law grant mercy and not give the death penalty if they found the aggravating circumstances. Sympathy is not a proper factor for a jury to consider in assessing punishment, but a jury may consider mercy. *State v. Clemmons,* 753 S.W.2d 901, 910 (Mo. banc 1988). The prosecutor's argument in this case fell short of arguing that the jurors may not lawfully grant mercy by giving a life sentence. It was, at most, an incomplete discussion of the law, which was neither misleading nor false and, as such, was not a basis for finding an abuse of discretion or plain error. *State v. Twenter,* 818 S.W.2d 628, 634 (Mo. banc 1991); *State v. Clemmons,* 753 S.W.2d at 910. A prosecutor may argue, as was done here, that the defendant

should not be granted mercy. *State v. Petary*, 781 S.W.2d 534, 541 (Mo. banc 1989).

██ Defendant also argues that the prosecutor misstated the law by stating in closing argument that there were three aggravating circumstances. Defendant claims there were only two. The argument is specious. Three aggravating circumstances were submitted to the jury. Those were that the murder of Willie (1) involved depravity of mind, (2) was committed while defendant was engaged in the unlawful homicide of Lloyd Lawrence, and (3) was committed while defendant was engaged in the unlawful homicide of Frankie Lawrence. Each homicide was a separate crime for purposes of instructing on aggravating circumstances. In this case the jury was properly instructed on the law. The prosecutor did not mislead the jurors on the facts or the law as contained in the aggravating circumstance instruction.

██ Finally, defendant argues that the state improperly shifted the burden of proof by reminding the jury that the defense had promised, but failed, to present evidence that defendant was falsely charged with nonsupport and that defendant had reason to distrust law enforcement officers in Stone and Taney County. Defendant claims this was an improper shifting of the burden of proof. The argument was a response to defense counsel's opening statements in which he suggested that the child support warrants were not issued upon facts but upon some hostility on the part of law enforcement officers toward defendant. The thrust of the defense strategy was to imply that defendant was being "framed" by overzealous county officers. Prosecutors are entitled to argue matters supported by the evidence or matters reasonably inferable from the record. *State v. Clemmons*, 753 S.W.2d 901, 909 (Mo. banc 1988). That includes pointing out to the jury an absence of evidence to support a theory suggested by the defendant. *State v. Roberts*, 709 S.W.2d 857, 867 (Mo. banc 1986).

## V.

██ During cross-examination of Retha Lawrence, a daughter of Lloyd Lawrence, defendant attempted to prove that Lloyd Lawrence had once been charged with raping another of his daughters. The state's objection to the testimony was sustained. A claim of error was not preserved in the motion for new trial and thus is considered only for plain error.

██ Defendant now argues that the evidence of the earlier rape was relevant because (1) it established defendant's fear that Lloyd Lawrence would harm Mary Epps and (2) the evidence was "reverse victim impact" evidence. Defendant failed to make any offer to show what this witness knew about the rape charge or that her knowledge of the charges was other than hearsay. Even if relevant, hearsay evidence is inadmissible. In addition, defendant failed to establish how a rape charge against Lloyd Lawrence at some unknown time in the past was logically connected to defendant's claim of a present fear for the safety of Mary Epps. Finally, the testimony was not offered as "reverse victim impact" evidence because it was offered during the guilt phase, not during the punishment phase. The evidence was not relevant to the question of defendant's guilt or innocence of the murder of Willie Lawrence. The claim that the testimony should have been admitted is meritless.

## VI.

### A.

██ Defendant offered an instruction on second degree murder, which was refused by the trial court. The reason given by the trial court for refusing to give the instruction was that it was not supported by the evidence. The principal distinction between first and second degree murder is the requirement of the first-degree offense that the murderer deliberated on the matter of the killing beforehand. Trial courts are not obligated to instruct on a lesser included offense unless there is a basis for a verdict acquitting the defendant of the greater offense and convicting him

of the included offense. *State v. Murray,* 744 S.W.2d 762, 773 (Mo. banc 1988). Defendant makes essentially two arguments which he claims justified the giving of the lesser included offense instruction on second degree murder.

The first argument is that Mary Epps testified defendant was "paranoid," "crazy with fear about being killed" by Lloyd Lawrence, a "different man," and "insanely obsessed" during the period of time defendant and Epps were returning to Missouri. He argues that Epps' characterizations form a basis for finding an absence of deliberation. Deliberation requires cool reflection for any length of time, no matter how brief. § *565.002(3)*. Thus, if defendant reflected coolly, for even a moment, during the months leading up to the killings, there was evidence of deliberation. Even though Mary Epps may have the opinion that defendant was "paranoid," "crazy," or "obsessed," defendant's competency to deliberate was not at issue.[2]

Even assuming defendant had a compelling hatred, anger, or fear toward Lloyd Lawrence, throughout this three month period preceding the murders his conduct and words were those of a cold, calculating, highly motivated assassin who planned and executed three murders, with chilling attention to the details of ensuring the death of his victims and avoiding identification or capture. From the time defendant began his circuitous trek back to Missouri, his mind was set on killing Lloyd Lawrence. He began by accumulating a formidable arsenal of deadly weapons including sufficient ammunition not only to kill Lawrence but any others who happened to be present. He told Epps he would kill Lawrence. Defendant planned to kill Lawrence at a place where Lawrence was likely to be isolated but not alone. Two days before the killings, defendant had Epps drop him off near the Lawrence cabin and arranged a signal to pick him up. He clothed himself in camouflage and put camouflage paint on

exposed parts of his face. He scouted the area for a full day prior to the killings. On the morning of the murders, he constructed a blind. After that, he hid in the blind for several hours, lying in wait for the opportunity to carry out his deadly plan. No rational fact finder could conclude that the defendant committed this homicide but that he did not deliberate on the killing.

The second claim is that the jury could have found that there was no deliberation as to Willie Lawrence. That claim is equally unsound. By the defendant's own admission he shot Willie to avoid identification. His preparations included obtaining a variety of weapons and ammunition far in excess of that needed to kill Lloyd Lawrence. Defendant plainly envisioned the potential need to kill persons other than Lloyd Lawrence, although he might have preferred not to kill them. The killing of potential witnesses was an integral part of the overall preconceived scheme to overcome any resistance, avoid detection and make good an escape. The only reasonable conclusion to be drawn from defendant's conduct is that he reflected coolly on the possibility of killing persons other than Lloyd Lawrence. In addition, after having shot each of the Lawrences, defendant approached them and shot each once more in the head from extremely close range, the last of the three being Willie. Because defendant formulated a deliberate plan for killing Lloyd Lawrence which encompassed the killing of others if necessary to carry out the mission, no second degree murder instruction was required.

Numerous cases have held that second degree murder instructions are not warranted when the evidence supports only a finding of deliberate murder. *See State v. Murray,* 744 S.W.2d 762 (Mo. banc 1988); *State v. Amerson,* 518 S.W.2d 29 (Mo. 1975); *State v. Parker,* 509 S.W.2d 67 (Mo. 1974); *State v. Crow,* 486 S.W.2d 248 (Mo. 1972); *State v. Holland,* 354 Mo. 527, 189 S.W.2d 989 (1945). Cases of other jurisdic-

---

**2.** Other than her characterizations of defendant's attitudes, Epps' testimony does not contain facts upon which her opinions were based. Ordinarily, such opinions are inadmissible on the issue of insanity. *State v. Preston,* 673

S.W.2d 1, 8 (Mo. banc 1984). In addition, the question of mental disease or defect excluding responsibility was not raised by defendant prior to trial, and the issue was not before the trial court. § *552.030.2.*

tions support this conclusion. *See, e.g., State v. Vickers,* 129 Ariz. 506, 633 P.2d 315 (1981); *Jones v. People,* 711 P.2d 1270 (Colo.1986); *State v. Garcia,* 233 Kan. 589, 664 P.2d 1343 (1983); *State v. McGuire,* 110 N.M. 304, 795 P.2d 996 (1990); *State v. Strickland,* 307 N.C. 274, 298 S.E.2d 645 (1983); *Duvall v. State,* 825 P.2d 621 (Okl. Cr.1991); *State v. Tillinghast,* 465 A.2d 191 (R.I.1983); *State v. Anderson,* 41 Wash.App. 85, 702 P.2d 481 (1985). These holdings are reinforced by statute. A trial court "shall not be obligated to charge the jury with respect to an included offense unless there is a basis for a verdict acquitting the defendant of the offense charged and convicting him of the included offense." § *556.046.2.*

 It is true that in most homicide cases, a defendant is entitled to a second degree murder instruction, if requested. This is particularly true where the evidence of deliberation is contradictory and confusing. *State v. Stepter,* 794 S.W.2d 649, 653 (Mo. banc 1990). But here, the defendant did not claim to be suffering from some mental disease or defect making him incapable of deliberation and the only evidence is that the defendant made elaborate plans and preparations over an extended period of time to commit murder. The stealth and cunning with which the plans were made and executed bear the indelible stamp of cool reflection by the defendant. On this record, no rational fact finder could conclude that the person who ambushed the Lawrences acted without deliberation. No second degree murder instruction is required.

The opinion here does not run afoul of *Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), because that case required lesser included offense instructions only where the evidence "leaves some doubt with respect to an element that would justify conviction of a capital offense." 447 U.S. at 637, 100 S.Ct. at 2389. In this case the defendant was competent, and *no doubt exists about the words and acts of deliberation leading up to the homicides.*

## B.

Defendant argues that Instructions No. 4 and No. 14 (MAI–CR 3d 302.04 and 313.02), which define "reasonable doubt," improperly diminish the meaning of "reasonable doubt." Defendant asks this Court to reexamine the issue in light of *Cage v. Louisiana,* 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990). Defendant has not preserved this point and requests plain error review. The precise issue was addressed in *State v. Griffin,* 818 S.W.2d 278, 282 (Mo. banc 1991). There is no need to reexamine this issue. The instructions do not violate any of defendant's constitutional rights.

## C.

 Defendant claims that Instruction No. 19 on aggravating circumstances was improper in two respects. However, neither of these specific claims was preserved, and thus review is limited to plain error. The first complaint is that "unlawful homicide" was not defined when it was used in an aggravating circumstance instruction. While it is true that an explanation of unlawful homicide should have been given, there was no manifest injustice in failing to define the term. In finding the defendant guilty of first degree murder of Willie Lawrence during the guilt phase, it was obvious to the members of the jury that the defendant was also guilty of the murder of Lloyd and Frankie Lawrence.

 Defendant's second claim regarding Instruction No. 19 is that it was error to submit the aggravating circumstance that the murder "was committed while the defendant was engaged in the commission of another unlawful homicide" twice. It is not improper to submit two aggravating circumstances under § 565.032.2(11), where the murder was committed while the defendant was engaged in perpetrating two distinct felonies. *State v. McMillin,* 783 S.W.2d 82, 104 (Mo. banc 1990); *State v. Petary,* 781 S.W.2d at 544. Since the homicides of Lloyd and Frankie Lawrence were each separate crimes, there was no error, plain or otherwise, in submitting each homicide as a separate aggravating circumstance.

### D.

█ Defendant claims it was plain error to submit Instruction No. 21 because of its improper reference to another instruction. Instruction No. 21 is patterned after MAI–CR 3d 313.44 and reads:

If you decide that one or more sufficient aggravating circumstances exist to warrant the imposition of death as submitted in *Instruction No. 19,* each of you must then determine whether one or more mitigating circumstances exist which outweigh the aggravating circumstance or circumstances so found to exist. In deciding that question, you may consider ... (emphasis added.)

Instruction No. 19 is patterned after MAI–CR 3d 313.40. The proper instruction to fill in the blank in the form instruction was No. 20, which is patterned after MAI–CR 3d 313.42. *See MAI–CR 3d, Note on Use No. 3.* Instruction No. 20 informs the jury of their duty to determine if the aggravating factors submitted under Instruction No. 19 which they found to exist warranted the imposition of the death penalty. Instruction No. 20 further instructed the jury that if they did not find the aggravating circumstances sufficient to warrant the death penalty, they must assess punishment at life imprisonment. The aggravating circumstances which the jury found to exist under Instruction No. 19 and the aggravating circumstances which the jury decided warranted the death penalty under Instruction No. 20 were precisely the same factors. There is simply no way for this error to confuse the jury or cause them to do anything other than properly weigh the aggravating circumstances against the mitigating circumstances. There was no prejudicial error in the incorrect reference in Instruction No. 21, and certainly no manifest injustice.

### E.

█ Defendant claims the trial court should have submitted his proffered Instruction D, which included three specifically listed nonstatutory mitigating circumstances. Under the mitigating circumstance instruction which was offered, Instruction No. 21, was the following statement: "You may also consider any circumstances which you find from the evidence in mitigation of punishment." Because the jury is permitted to consider nonstatutory mitigating circumstances, there is no requirement that the instructions list nonstatutory mitigating circumstances. *State v. Wacaser,* 794 S.W.2d 190, 195 (Mo. banc 1990); *MAI–CR 3d 313.44, Note on Use 6.*

### F.

█ Defendant claims that Instruction No. 19 submitting aggravating circumstances should not have included the aggravating circumstance as to "whether the murder of William Lawrence involved depravity of mind and whether as a result thereof the murder was outrageously and wantonly vile, horrible, and inhuman." Defendant claims that the "depravity of mind" circumstance is unconstitutionally vague.

In this case, the jurors were instructed that they could make a determination of depravity of mind only if they found:

that the defendant killed William Lawrence, knowing that William Lawrence was physically disabled and helpless and that defendant thereby exhibited a callous disregard for the sanctity of all human life, and that the defendant, while killing William Lawrence or immediately thereafter, purposely mutilated or grossly disfigured the body of William Lawrence by an act beyond that necessary to cause his death, and that the defendant killed William Lawrence as part of defendant's plan to kill more than one person, and thereby exhibited a callous disregard for the sanctity of all human life.

Because the narrowing definition of the aggravating circumstance in question is adequate to guide the sentencer, Instruction No. 19 was not unconstitutionally vague.

### VII.

### A.

█ In his post-conviction motion, defendant complains that his attorney was ineffective in abandoning the mental defect defense.

Defense counsel testified that he had defendant examined by a psychiatrist, Dr. Clary, and a psychologist, Dr. Reuterfors. Defense counsel believed Dr. Clary tended to be defense oriented in cases such as defendant's. Although both of the doctors concluded that defendant's mental status tended to be paranoid, both indicated defendant was not suffering from any mental disease or defect excluding responsibility and that the homicides were calculated, planned, and intentional. For that reason, defense counsel elected not to pursue that avenue of defense. His theory of defense was that the defendant's fear of Lloyd Lawrence were real rather than imagined.

After defendant was convicted, post-conviction counsel had defendant examined by Dr. O'Connor, another psychologist, who examined the defendant four times and, in addition, reviewed the trial testimony and the medical reports of Drs. Reuterfors and Clary. He concluded that defendant suffered from a "delusional disorder" and could not have been cool or rational.

The problem with the defendant's position is that Dr. O'Connor was unknown to trial counsel. Where trial counsel has, as here, made reasonable efforts to investigate the mental status of defendant and has concluded that there is no basis in pursuing that defense, counsel should not be held ineffective for not shopping for a psychiatrist who would testify in a particular way. *Elledge v. Dugger*, 823 F.2d 1439, 1447 n. 17 (11th Cir.1987). *See also Putney v. State*, 785 S.W.2d 562, 563 (Mo.App. 1990), and *Shields v. State*, 757 S.W.2d 247, 248 (Mo.App.1988). Trial counsel satisfied any requirement that he pursue the defense of mental disease or defect by obtaining the opinions of Drs. Clary and Reuterfors. Counsel had no cause to impugn those opinions. Trial counsel's conduct in having the defendant examined by two mental health professionals was unquestionably a thorough investigation. His decision not to pursue that line of defense was clearly a matter of trial strategy. "Strategic choices made after a thorough investigation of the law and the facts relevant to plausible options are virtually unchallengeable." *Strickland v. Washington*, 466 U.S. 668, 690–91, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984). The first claim of ineffective assistance of counsel is denied.

**B.**

Defendant claims that counsel was ineffective in failing to object to various allegedly improper arguments made by counsel. The motion court found that the prosecutor's statements were not so clearly improper as to establish a claim of ineffective assistance of counsel due to the defense attorney's failure to object. This Court has previously reviewed the claims of error in closing argument. Defendant has failed to demonstrate that it would have been an abuse of discretion to have overruled any objection to the argument. Accordingly, the claim that counsel was ineffective in failing to object is without merit.

**C.**

Defendant claims trial counsel was ineffective for not submitting a statutory mitigating circumstance that defendant did not appreciate the criminality of his conduct or have the ability to conform his conduct to the requirements of law. As noted previously, defense counsel made a thorough investigation and a strategic choice not to call the mental health professionals who had examined defendant to testify. Had defendant called those witnesses, they would not have established any absence of capacity to commit any homicide. As a result of that, there was no admissible evidence to support a mitigating circumstance instruction regarding impaired or diminished capacity. In addition, the claim was not raised by timely post-conviction motion under Rule 29.15. The claim is time barred. *Sloan v. State*, 779 S.W.2d 580, 581 (Mo. banc 1989).

**D.**

The last claim of ineffective assistance of counsel is that counsel was ineffective because during his objection to the photographs during the penalty phase, he said, "[H]as no probative value ... I'm

sure we'll see much more bloody photographs, but this is the worst one that I have seen in thirty years in one hundred homicide cases." The prosecutor referred to this objection in closing argument.

Defendant compares defense counsel's objection to arguing to the jury that the defendant's crimes were exceptionally brutal or horrendous. In this case, counsel was merely exercising his duty to object vigorously to what he perceived to be highly inflammatory evidence. His comments were directed to the photographs, not to the character of the crimes. It would be odd indeed if the vigorous making of objections were held to be ineffective assistance of counsel. This claim is also without merit.

### VIII.

■ In all capital cases this Court is required to make a review of the death penalty to ensure that it was not imposed under the influence of passion, prejudice or any other arbitrary factor, that the evidence supports the findings of aggravating statutory circumstances, and that the sentence of death is not excessive or disproportionate to the penalty imposed in similar cases. § *565.035.3*. This Court has reviewed the facts and has determined that the death sentence was not imposed as a result of passion, prejudice or other arbitrary factors, and that the evidence supports the finding of the aggravating circumstances previously noted.

Where there are multiple homicides, the killing of a person who is disabled, or an intricate, well thought out plan of how the killing is to be committed, all of which existed here, the death penalty is not at all unusual. *State v. Reese*, 795 S.W.2d 69 (Mo. banc 1990); *State v. Petary*, 781 S.W.2d 534 (Mo. banc 1989); *State v. Young*, 701 S.W.2d 429 (Mo. banc 1985); *State v. Leisure*, 749 S.W.2d 366 (Mo. banc 1988). In addition, the defendant admitted the homicides arose out of his involvement with the manufacture, distribution and use of illegal drugs. *State v. McMillin*, 783 S.W.2d 82 (Mo. banc 1990). The sentence of death is not disproportionate.

For all the reasons set forth above, the judgments are affirmed.

All concur.