Leon V. TAYLOR, Appellant,

v.

STATE of Missouri, Respondent.

No. SC 85119.

Supreme Court of Missouri,
En Banc.

Jan. 27, 2004.

Rehearing Denied March 9, 2004.

Melinda K. Pendergraph, Office of Public Defender, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Breck K. Burgess, Asst. Atty. Gen., Jefferson City, for Respondent.

WILLIAM RAY PRICE, JR., Judge.

## I.

Leon Taylor was initially convicted of first-degree murder, first-degree robbery, first-degree assault, and armed criminal action and was sentenced to death on the first-degree murder charge and life imprisonment plus 315 years for the other charges. This Court affirmed the convictions but granted a new penalty phase trial on the murder charge. In the second penalty phase trial, the jury assessed the death penalty and Taylor was so sentenced. This Court affirmed. Taylor filed a Rule 29.15 motion and, in a detailed 42–page order, the trial court denied relief. This Court has jurisdiction. *Mo Const. art. V, section 10;* standing order, June 16, 1988. The judgment is affirmed.

## II.

### A.

On April 14, 1994, Leon Taylor, along with his half brother and half sister, robbed a gas station in Jackson County.[1] During the robbery, without any particular cause, Taylor shot and killed the gas station attendant while the victim's step-daughter watched. After shooting the attendant, Taylor turned the gun on the stepdaughter and pulled the trigger. The gun, however, jammed and did not discharge. Frustrated, Taylor locked the young girl in the back room and returned to the car to obtain another gun with which to shoot her. Fortunately, Taylor's half brother and half sister convinced him to leave.

Taylor was tried and convicted of first-degree murder, first-degree assault, first-degree robbery and three counts of armed criminal action. The jury could not agree upon punishment for the murder conviction. The trial judge sentenced Taylor to death. This Court affirmed the convictions but remanded for a new sentencing phase on the murder conviction, based on the prosecutor's improper closing argument which urged the jury to decide the case based on emotion. *State v. Taylor*, 944 S.W.2d 925 (Mo. banc 1997).

A new sentencing proceeding was held and a jury assessed punishment at death. This Court affirmed. *State v. Taylor*, 18 S.W.3d 366 (Mo. banc 2000). Taylor sought post-conviction relief in the form of a motion to vacate judgment and sentence pursuant to Rule 29.15. Taylor alleged ineffective assistance of counsel. The motion was overruled, and Taylor appealed to this Court.

### B.

In the second penalty phase, Taylor was represented by Robert Wolfrum and Teoffice Cooper. The motion court noted that both of these attorneys "are experienced lawyers with substantial training in handling death penalty cases." Prior to the second penalty phase, both attorneys had the chance to consult with Taylor's counsel from the first trial, whom the motion court noted "were also experienced death penalty litigators." Wolfrum testified that he has been handling capital cases exclusively since 1989. Both Wolfrum and Cooper have had experience in capital litigation throughout the state of Missouri. Currently Wolfrum supervises a group of attorneys in St. Louis who all handle death penalty litigation.

At the 29.15 hearing, Wolfrum was called to testify, but Cooper was not. Cooper is presumed to have undertaken adequate investigation and made adequate strategic decisions. Taylor has failed to carry his burden of proof regarding his allegations of Cooper's ineffective assistance of counsel. See, *State v. Tokar*, 918 S.W.2d 753, 768 (Mo. banc 1996), *cert. denied*, 519 U.S. 933, 117 S.Ct. 307, 136 L.Ed.2d 224 (1996).

### C.

The standard of review for claims of ineffective assistance of counsel is well settled in this state. "[W]e look to whether appellant has established below that his counsel's performance failed to conform to the degree of skill, care, and diligence of a reasonably competent attorney, and that the defendant was thereby prejudiced." *State v. Tokar*, 918 S.W.2d 753, 761 (Mo. banc 1996) (citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Sto-*

---

1. For a more detailed recitation of the facts, see *State v. Taylor*, 944 S.W.2d 925, 930 (Mo. banc 1997), and *State v. Taylor*, 18 S.W.3d 366, 369 (Mo. banc 2000).

*rey,* 901 S.W.2d 886, 900 (Mo. banc 1995); *State v. Wise,* 879 S.W.2d 494, 524 (Mo. banc 1994)). The appellant has the burden of proving prejudice by showing a "reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *Id.*

■ In addition, a strong presumption exists that counsel was effective, which appellant must overcome by a preponderance of the evidence. *Id.* In examining appellant's claims of ineffective assistance of counsel, this Court should give deference to the decisions made by appellant's counsel. *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id.*

■ "Strategic choices made after a thorough investigation of the law and the facts relevant to plausible opinions are virtually unchallengeable." *Tokar,* 918 S.W.2d at 761 (citing *Strickland,* 466 U.S. at 690–91, 104 S.Ct. 2052). Among the relevant factors for deciding whether particular strategic choices are reasonable is "the potential for prejudice from taking an unpursued line of defense." *Strickland,* 466 U.S. at 681, 104 S.Ct. 2052.

■ Appellate review of the motion court's findings of fact and conclusions of law on a Rule 29.15 motion is limited to a determination of whether the findings and conclusions are clearly erroneous. Rule 29.15(k); *see State v. Kenley,* 952 S.W.2d 250, 266 (Mo. banc 1997). Findings of fact and conclusions of law are clearly erroneous only if after a review of the whole record, the Court is "left with a definite and firm impression that a mistake has been made." *State v. Taylor,* 929 S.W.2d 209, 224 (Mo. banc 1996).

## III.

### A.

■ Taylor first alleges he was denied effective assistance of counsel because his counsel in the second penalty phase failed to investigate, rebut and object to the prosecutor's suggestion that Taylor had stabbed a man to death in 1975. *See State v. Hardin,* 558 S.W.2d 804 (Mo.App.1977). The prosecutor's comment arose from a second-degree murder conviction, to which Taylor pled guilty, for the death of Jessie Howarter, who died as a result of 16 stab wounds. Taylor asserts that he pled guilty to stabbing at Howarter's side, but he was unsure whether he inflicted any wounds and that if he did, the wounds he inflicted did not cause Howarter's death. "Taylor either stabbed or attempted to stab Howarter." *Id.* at 806.

Rather, Taylor argues, his codefendant, Carl Hardin, was the one who stabbed Howarter to death. Taylor submits that the state cannot rely on his testimony that he did not inflict the fatal wounds to convict Carl Hardin and then later argue Taylor "stabbed a man to death" to show he was a prior offender. Taylor argues the prosecution's comments were prejudicial and, as a result, his counsel should have objected.

■ At Taylor's 29.15 hearing, Wolfrum testified that he had read the police reports related to the incident as well as the information from the *Hardin* case. He also testified that he was aware that the state was allowed to read the information to the jury, which included Taylor's confession to stabbing at Howarter's side.[2] Wolfrum further acknowledged he was aware that under Missouri law, an accom-

---

2. An exhibit at the *Hardin* trial also showed that the bloodstains on Howarter's shirt, Tay- lor's pants, and the butcher knife that was used to murder Howarter all matched.

plice is as guilty as the principal of the crime. *See generally State v. Wurtzberger,* 40 S.W.3d 893, 895 (Mo. banc 2001).

Wolfrum also testified that prior to the second penalty phase trial he was aware that the state would rely heavily upon the conviction and that he had strong feelings that the conviction would be damaging to Taylor's case. Wolfrum testified that he was also concerned about how the jury would react to the fact that Taylor had testified against Hardin. The motion court noted that both Wolfrum and Cooper spent substantial time prior to the second penalty phase trial advocating for specific voir dire procedures that would touch upon the prior murder conviction. As a result, each juror at the second penalty phase was subject to individual voir dire on the subject of Taylor's prior murder conviction.

The motion court found Wolfrum's testimony at the 29.15 hearing indicated that he and his co-counsel did not object to the prosecutor's references to the prior conviction because they felt that "objecting excessively to the evidence of the murder conviction could unduly emphasize what they considered to be damaging evidence." As a result, they decided it was better trial strategy not to object.

Taylor had pled guilty to second-degree murder as a result of stabbing at Howarter. In addition, the medical examiner in the case substantiated the existence of a flank wound that corroborated Taylor's testimony. Whether or not he inflicted the fatal wound, he participated in a violent assault that left a man dead. If Taylor's counsel had objected to the prosecutor's statements, they would have been drawn into the details of Howarter's death to provide the context for Taylor's testimony that he did not inflict the fatal stab wound. Given that Howarter suffered 16 stab wounds and evidence existed that Taylor participated in the attack, it is not unrea-sonable that Taylor's counsel would choose to ignore the prosecutor's statement rather than exposing the jury to more gory details of the murder. Moreover, as the motion court noted, an effort by Taylor to trivialize the prior murder plea and conviction in the brutal circumstances of that case could have been "problematic."

▮▮ This Court is to give deference to the decisions made by appellant's counsel. *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. "There is a presumption that counsel's alleged omissions were sound trial strategy." *Tokar,* 918 S.W.2d at 766 (citing *Sidebottom v. State,* 781 S.W.2d 791, 795 (Mo. banc 1989)). Taylor's counsel made a strategic decision to avoid putting emphasis on the details of Taylor's previous murder conviction so as not to damage his case. The evidence shows that Wolfrum made a sufficient investigation into the facts surrounding the conviction as well as the law regarding accomplice liability. As mentioned, "[s]trategic choices made after a thorough investigation of the law and facts relevant to plausible opinions are virtually unchallengeable." *Id.* at 761. Taylor's counsel's performance met the degree of skill, care, and diligence of a reasonably competent attorney. *Id.*

▮▮ Likewise, Taylor has failed to show "a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *Id.* Rather, the evidence shows that if Wolfrum or Cooper had objected and the details of the previous murder were revealed to the jury, it is likely Taylor's case would have been harmed and the outcome would have been the same. The motion court was not erroneous, clearly or otherwise, when it denied Taylor's motion on this point.

### B.

█ Taylor next alleges he was denied effective assistance of counsel because his attorneys failed to investigate and present evidence of his mental state at the time of the robbery and murder. Specifically, Taylor argues Dr. William Logan should have been called to establish the statutory mitigators of extreme mental or emotional disturbance and substantial impairment of Taylor's capacity to appreciate the criminality of his conduct.

At the 29.15 hearing, Wolfrum testified that he and his co-counsel hoped to get the jury to think of Taylor as a victim of his disadvantaged background and to avoid focusing on specific details at the time of the crime. Wolfrum testified that they hired Dr. Robert Smith, a forensic and clinical psychologist, to evaluate Taylor. Dr. Smith's report contained findings similar to Dr. Logan's. As the motion court noted, "A very substantial part of the important information utilized by Dr. Logan and Dr. Smith was the same information that was presented by counsel to the jury during the course of the retrial of the penalty phase." Dr. Smith's report found that Taylor had alcohol dependence, cannabis dependence, post-traumatic stress disorder, dysthymic disorder, and mixed personality disorder with antisocial and paranoid features.

Wolfrum testified, however, that they specifically avoided having Dr. Smith testify about Taylor's mental state at the time of the murder because they felt that tying his family history to the events of the night of the crime would have been problematic. Instead, Wolfrum testified that he and his co-counsel also retained Robert Dempsey, a psychiatric and clinical social worker and therapist, who testified regarding the fact that Taylor's family life affected his ability to make reasoned and good choices. The testimony of both of these professionals was presented at the second penalty phase to establish that Taylor was a victim of his circumstances.

This line of defense was supplemented by the testimony of Taylor's relatives, friends of Taylor's relatives, a former judge, and a police officer. Penalty phase counsel also presented evidence that Taylor's mother had abused him, stabbed and shot others, and was a chronic alcoholic who drank while Taylor was *in utero* and gave him alcohol as a child. Penalty phase counsel presented evidence that Taylor never received guidance about what was right and wrong and that he was sexually abused when he was five years old. In addition, counsel presented evidence that Taylor suffered from depression when he was a teenager. All of this evidence was presented in a more general sense as mitigating evidence to show that Taylor was the victim of a troubled upbringing.

Again, Wolfrum stated he was aware of the possibility of presenting evidence similar to Dr. Logan's report regarding Taylor's mental state at the time of the murder but thought it was not a strong direction to pursue. Wolfrum noted that he and co-counsel chose not to include Dr. Logan's type of testimony because it might result in opening the door to damaging statements Taylor had made about the murder. As Wolfrum testified, "[I]f you put a doctor on, you're opening him up to some cross examination by the State that with hearsay they might find useful ... that's one danger that might not otherwise come in." Dr. Logan testified at the 29.15 hearing that Taylor knew right from wrong, was able to appreciate the wrongfulness of his actions at the time of the murder, and the murder was not caused by post-traumatic stress disorder but may have been caused by Taylor's despondency and intoxication.

■ "Generally, the selection of witnesses and the introduction of evidence are questions of trial strategy and virtually unchallengeable." *State v. Kenley*, 952 S.W.2d 250, 266 (Mo. banc 1997). "[D]efense counsel is not obligated to shop for an expert witness who might provide more favorable testimony." *Id.* at 268 (citing *Taylor*, 929 S.W.2d at 225; *State v. Mease*, 842 S.W.2d 98, 114 (Mo. banc 1992)).

It was not unreasonable trial strategy for Taylor's penalty phase counsel to attempt to establish that Taylor himself was a victim of a disadvantaged background. The testimony of Dr. Smith, Dempsey, and the other witnesses was presented toward this goal. Penalty phase counsel were not obligated to shop for another expert. Trial counsel also were not unreasonable in fearing that the adverse aspects of Dr. Logan's testimony might outweigh the usefulness of his other testimony and might refocus the jury on the brutal facts of the crime.

The motion court's finding on this issue was not erroneous, clearly or otherwise, when it denied Taylor's motion on this point.

### C.

■ Taylor next argues he received ineffective assistance of counsel because his penalty phase counsel failed to present evidence of his mental retardation. In support of this allegation, Taylor cites Dr. Logan's findings that Taylor's use of inhalants decreased his IQ by 10 points and placed him in the borderline mentally retarded range. Taylor argues that testimony regarding his mental retardation could have prevented him from receiving the death penalty because the Eighth Amendment precludes executing the mentally re-

tarded. *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).

The state argues Taylor waived this claim by failing to raise it in his 29.15 motion. Taylor argues he pled this sufficiently by putting his mental state in issue as well as by pleading counsel's failure to call Dr. Logan at the penalty phase trial. At no point does Taylor's 29.15 motion mention "mental retardation." He pled that his counsel failed to have Dr. Smith testify how "years of physical, emotional, and sexual abuse resulted in irreversible psychological damage to Leon which impacted his behavior on the night of the crime." Likewise, he pled that his counsel failed to have a psychiatrist testify as to how his childhood affected his "adult mental health" and "ability to think cogently and rationally or to control his impulses."

Finally, he pled that his counsel failed to present evidence that the emotional disappointments he suffered, the marijuana and alcohol he ingested, in addition to his post-traumatic stress disorder and depression, put him "under the influence of extreme mental or emotional disturbance" and "diminished [his] capacity" at the time of the crime. However, none of these pleadings amounts to a plea of failure to present evidence of mental retardation. Taylor did not specifically plead mental retardation.

■ Nonetheless, even if Taylor had successfully pled the claim, evidence in the record does not support a finding that Taylor's counsel was ineffective in failing to pursue a defense based on mental retardation. First, Taylor failed to present any witness who would testify that he fit the definition of "mental retardation" set out in section 565.030.6.[3] Second, Dr. Lo-

---

**3.** Section 565.030.6 defines "mental retardation" as:

[A] condition involving substantial limitations in general functioning characterized

gan's testimony that Taylor's IQ fell to "borderline retarded" was only while he used chemical inhalants. Dr. Logan also testified that Taylor's IQ was in the "low normal range." Finally, to emphasize the significance of this tenuous theory would require counsel to highlight that Taylor was acting under the voluntary influence of inhalants during the crimes. Evidence of substance abuse can be seen as an aggravating circumstance, rather than a mitigating circumstance; thus, it is reasonable for trial counsel to avoid such evidence to prevent damage to a defendant's case. *See Kenley*, 952 S.W.2d at 269. Taylor has not proven that his counsel's failure to pursue a claim of mental retardation was unreasonable.

Along with Taylor's claim of ineffective assistance of counsel for failure to present evidence of his mental retardation, he alleges that because he was borderline mentally retarded at the time of the offense, the death penalty is disproportionate and unconstitutional. *See Atkins*, 536 U.S. at 304, 122 S.Ct. 2242. Because Taylor has failed to present any credible evidence in support of his claim that he was mentally retarded at the time of the offense, his sentence of death is not unconstitutional under *Atkins*.

■■■■■ Further, his sentence is not disproportionate to the offense. The evidence supports the jury's finding that Taylor was a person who has one or more serious assaultive criminal convictions, as he had previous convictions for second-degree murder, attempted robbery in the first degree, and robbery in the first degree. Section 565.032.2(1) (statutory ag-

gravating factor for first-degree murder). The evidence also supports the jury's finding that Taylor committed the murder for the purpose of receiving money or anything of monetary value from the victim or another. Section 565.032.2(4) (statutory aggravating factor for first-degree murder). As this Court noted in Taylor's previous proceedings, "A death sentence will be affirmed if even one valid statutory aggravating circumstance is found." *Taylor*, 18 S.W.3d at 378.

Finally, Taylor murdered a man, without cause, in front of the man's stepdaughter and then attempted to kill the girl as well. The imposition of the death penalty in such a circumstance cannot be said to be disproportionate. *Tokar*, 918 S.W.2d at 773.

Taylor has not presented any credible evidence to support this claim.

### D.

■■■■ Taylor next alleges ineffective assistance of counsel for failure to investigate and present additional evidence through expert Dr. Smith that he suffered from depression, post-traumatic stress disorder, and alcohol and drug dependence. Taylor argues these establish the statutory mitigators of extreme mental or emotional disturbance and substantial impairment of capacity to appreciate the criminality of his conduct. Taylor argues this mitigation would have reduced his culpability and likely resulted in a life sentence. Taylor's argument here is closely related to the argument discussed in section III.B. above, and it simply focuses on additional testimony that might have been presented

by *significantly subaverage intellectual functioning* with continual extensive related deficits and limitations in *two or more* adaptive behaviors such as communication, self-care, home living, social skills, community use, self-direction, health and safety, func-

tional academics, leisure and work, which conditions are manifested and documented before eighteen years of age.
565.030.6 RSMo Supp.2001 (emphasis added).

through Dr. Smith instead of Dr. Logan's testimony.

At the 29.15 hearing, Wolfrum testified that he met with Dr. Smith, read Dr. Smith's reports, and corresponded with him. He testified that he was aware of Dr. Smith's findings and potential for testifying concerning Taylor's mental health. He also testified that Dr. Smith requested a trauma system inventory (T.S.I.) test to examine Taylor for post-traumatic stress syndrome. Taylor's counsel provided Dr. Smith with the results of a T.S.I. that had been performed on Taylor in 1998, but Dr. Smith wanted to retest him. Taylor's counsel had Dr. Smith retest Taylor and send the results to counsel. Wolfrum further testified he would not have discouraged further investigation by Dr. Smith unless he had a strategic reason for believing it would be harmful. He testified that funding was not an issue.

Wolfrum stated further that he and co-counsel chose to present a defense that asked for mercy based on Taylor's life history, rather than one that focused the jury on the facts of the murder by arguing Taylor could not control his actions at that time because of mental diseases or defects. Counsel testified he could have presented evidence of mental illness through Dr. Smith, but he thought it was not a strong defense to pursue.

Additionally, Wolfrum stated there were a number of harmful statements made by Taylor to Dr. Smith that could have come in on cross-examination if they tried to blame the murder on mental diseases or defects. Penalty phase counsel's strategic choices as to this issue cannot be said to be unreasonable. The motion court was not erroneous, clearly or otherwise, in denying Taylor's motion on this point.

### E.

Taylor finally argues his counsel was ineffective for failing to present evidence of Taylor's good conduct in prison and positive influence on others. Taylor argues he reached out to others, writing words of encouragement and expressing remorse for his past misdeeds.

Wolfrum testified that he and his co-counsel chose not to present a lot of evidence of Taylor's good conduct in prison for strategic reasons. If they had presented evidence of Taylor's good conduct in prison, the state may have introduced rebuttal evidence of Taylor's misconduct. Taylor's own evidence at the 29.15 hearing showed that while in the custody of the Department of Corrections, he had numerous institutional violations for offenses including fighting, assault, forcible sexual misconduct, rioting (which resulted in the death of one correctional officer and injuries to four others), theft, fraud, disobeying orders, possession or use of controlled substances, giving false information, a sanitary violation, tampering with a locking device, being out-of-bounds, possession of contraband, and destroying state property. It is not unreasonable that Wolfrum and his co-counsel would choose to avoid having this information presented to the jury.

Nonetheless, Wolfrum stated that they did call at least one witness to testify about the positive effects Taylor had on her. However, because calling many similar witnesses would have required them to put other death row inmates on the stand, Wolfrum stated they did not call others because they did not want the jury to infer that Taylor had been on death row. Wolfrum stated that during retrials of penalty phases in these cases, the potential for a jury to infer that the defendant has already been on death row is something to "worry about."

In addition, Wolfrum testified that they did not present evidence of Taylor's poetry

for strategic reasons. He noted that prosecutors can easily belittle the positive nature of poetry by putting it up against the crime for which the defendant was convicted. Wolfrum said he and his co-counsel were very concerned about Taylor maintaining credibility, and they felt that introducing evidence of his poetry might actually be damaging to the case. Taylor has failed to present evidence as to why this was an unreasonable trial strategy. As a result, Taylor has not demonstrated how he was prejudiced by this strategic choice.

The motion court's finding was not erroneous, clearly or otherwise, in denying Taylor's motion on this point.

## V.

The judgment is affirmed.

All concur.