Paul T. GOODWIN, Appellant,

v.

STATE of Missouri, Respondent.

No. SC 86278.

Supreme Court of Missouri,
En Banc.

May 2, 2006.

Rehearing Denied May 30, 2006.

Melinda K. Pendergraph, Office of the State Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. General, Leslie E. McNamara, Shaun J. Mackelprang, Asst. Attys. General, Jefferson City, for respondent.

WILLIAM RAY PRICE, JR., Judge.

### I) Introduction

Paul Goodwin was sentenced to death for the murder of Mrs. Joan Crotts, a widow in her sixties. This Court upheld his conviction and sentence on direct appeal. *State v. Goodwin,* 43 S.W.3d 805 (Mo. banc 2001). The motion court denied post-conviction relief under Rule 29.15. Goodwin now appeals the motion court's ruling. This Court affirms.

### II) Factual Background

In the summer of 1996, Goodwin moved into a boardinghouse near North Hanley Road in St. Louis County. The boardinghouse was next door to Mrs. Joan Crotts' home. Within a week or so of his arrival at the boardinghouse, Goodwin began confronting Mrs. Crotts. Goodwin continued to insult and curse her throughout the summer. In August, Goodwin was having a barbeque in the backyard of the boardinghouse and began throwing beer cans over the fence into Mrs. Crotts' yard. When Mrs. Crotts came out to complain, Goodwin picked up a sledgehammer and smashed a rock with it saying: "this is your head ... if you keep messing with me."

A short time later, Mrs Crotts left her home to attend a social function. Goodwin confronted her in the driveway and yelled: "get your fat ass back in the house, bitch. I've got one coming for you." Mrs. Crotts' daughter intervened and ended the confrontation, but Goodwin was evicted from the boardinghouse. As he left the boardinghouse, he said to Mrs. Crotts: "I'm going to get you for this, bitch."

A year and a half later, Mrs. Crotts called the police at 5:00 a.m. to report that someone had tampered with her vehicle. An officer arrived, and Mrs. Crotts reported that she had found some papers taken from her car and thrown on the ground. She also reported that her dogs had been let out of her backyard and that a step on the back porch was out of place. The officer found no suspicious persons in the neighborhood.

Goodwin had already entered Mrs. Crotts' house that morning and hid in the basement until after the police left. Goodwin then came up the basement stairs carrying a sledgehammer and confronted Mrs. Crotts in her kitchen. He grabbed her arm and forced her into the living room where he forced Mrs. Crotts to perform oral sex on him. He then took her back to the kitchen. While drinking a two-liter bottle of Pepsi, he wrote on a piece of paper "you are next," and forced her to walk to the head of the basement stairs. With both hands, he shoved her down the stairs. As she lay face down and unmoving at the bottom of the stairs, Goodwin watched her for a while. Then he hit the back of her head several times with the sledgehammer and left the house.

Mrs. Crotts' daughter found her, still alive, that afternoon, and Mrs. Crotts related these events to a police officer at the hospital. Mrs. Crotts died that evening. An autopsy revealed that Goodwin inflicted injuries all over her body. In addition to the skull fractures, which caused her death, she had bruises and injuries on her face, chest, shoulders, back, buttocks, knees, thighs, and both arms and hands. She had eight broken ribs and a broken hip. Many of the wounds were defensive wounds. Many of the injuries were not consistent with a fall down the stairs, but instead of a beating.

The police found the note and Pepsi bottle. Goodwin's fingerprints were on both. They also found bootprints in the spilled Pepsi. Two cigarette butts and a wrapper, the brand Goodwin smoked, were found in the basement. Just outside the door, police found Goodwin's hearing aid. After obtaining a warrant to search Goodwin's home, the police found blood stains on a pair of his jeans, underpants, and boots. The boots matched the bootprints left in the spilled Pepsi.

The police picked Goodwin up at work that day. After being offered a sign-language interpreter and being advised of his Miranda rights, Goodwin admitted to killing Mrs. Crotts and provided the details above.

A jury convicted Goodwin of murder and sentenced him to death. This Court affirmed his direct appeal. Goodwin then filed a motion for post-conviction relief in the motion court. The motion court denied a hearing for most of his claims. The motion court then denied the rest of his claims after a hearing.

### III) Legal standard

#### A) Prerequisites for post-conviction hearing

■ Before movant may be granted a post-conviction hearing by a motion court, he must show that he is entitled to a hearing. "If the court shall determine the motion and the files and records of the case conclusively show that the movant is

entitled to no relief, a hearing shall not be held. In such case, the court shall issue findings of fact and conclusions of law as provided in Rule 29.15(j)."

In order to be entitled to an evidentiary hearing, a movant must 1) cite facts, not conclusions, which, if true, would entitle movant to relief; 2) the factual allegations must not be refuted by the record; and 3) the matters complained of must prejudice the movant. *Belcher v. State,* 801 S.W.2d 372, 375 (Mo.App. 1990). An evidentiary hearing is not required if the motion court determines that the motion and the files and records of the case conclusively show that the movant is entitled to no relief. Rule 29.15(g). Appellate review of a motion court's action is limited to a determination of [whether] the findings and conclusions of ... the motion court are clearly erroneous. Rule 29.15(j).

*State v. Blankenship,* 830 S.W.2d 1, 16 (Mo. banc 1992).

### B) Requirements for post-conviction relief

 In order to actually receive post-conviction relief from the motion court, [f]irst, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To establish ineffectiveness, a defendant must show that counsel's representation fell below an objective standard of rea-

sonableness. To establish prejudice he must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Williams v. Taylor,* 529 U.S. 362, 390–91, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (internal citations omitted). "To prove ineffectiveness with regard to death penalty sentencing, [the defendant] must show that, but for his counsels' ineffective performance, there is a reasonable probability that the jury would have concluded after balancing the aggravating and mitigating circumstances, death was not warranted." *Rousan v. State,* 48 S.W.3d 576, 582 (Mo. banc 2001).

 When the motion court determines whether counsel was ineffective, "[a] strong presumption exists that trial counsel was effective and an appellant bears a heavy burden of overcoming that presumption by a preponderance of the evidence." *State v. Tokar,* 918 S.W.2d 753, 761 (Mo. banc 1996) (citations omitted). There is also "a presumption that counsel's alleged omissions were sound trial strategy." *Id.* at 766. "Trial strategy is not a ground for ineffective assistance of counsel." *State v. Chambers,* 891 S.W.2d 93, 109 (Mo. banc 1994). "Strategic choices made after a thorough investigation of the law and the facts relevant to plausible opinions are virtually unchallengeable." *Tokar,* 918 S.W.2d at 761 (quoting *Strickland,* 466 U.S. at 690–91, 104 S.Ct. 2052). "Where counsel has investigated possible strategies, courts should rarely second-guess counsel's actual choices." *Middleton v. State,* 103 S.W.3d 726, 736 (Mo. banc 2003).

### C) Review of motion court

 This Court's review of the motion court's denial of post-conviction relief

is limited to a determination of whether "the motion court clearly erred in making its findings of fact and conclusions of law." *Skillicorn v. State*, 22 S.W.3d 678, 681 (Mo. banc 2000), *cert. denied*, 531 U.S. 1039, 121 S.Ct. 630, 148 L.Ed.2d 538 (2000). A judgment is clearly erroneous when, in light of the entire record, "the court is left with the definite and firm impression that a mistake has been made." *Moss v. State*, 10 S.W.3d 508, 511 (Mo. banc 2000). The motion court's findings are presumed correct. *Black v. State*, 151 S.W.3d 49, 54 (Mo. banc 2004). "The question is whether, when all the mitigation evidence is added together, is there a reasonable probability that the outcome would have been different?" *Hutchison v. State*, 150 S.W.3d 292, 306 (Mo. banc 2004).

## IV) Points relied on

Goodwin alleges seven instances of trial counsel ineffectiveness and clear error by the motion court, in this appeal, as follows: 1) the motion court clearly erred because it found that Goodwin was not mentally retarded; 2) trial counsel failed to investigate and rebut the State's suggested motive that Goodwin blamed Mrs. Crotts for his eviction from the boarding house; 3) trial counsel failed to investigate and rebut the State's claim that Goodwin had previously threatened Mrs. Crotts with a sledgehammer; 4) trial counsel failed to investigate and present medical evidence, at trial, that Mrs. Crotts' injuries were caused by her fall down the stairs; 5) trial counsel failed to investigate Goodwin's ability to plan details and deliberate, or evidence that he was easily confused as a child; 6) trial counsel was ineffective for presenting inconsistent theories at the guilt and penalty phases; and 7) the motion court clearly erred by refusing to hold that lethal injection is cruel and unusual punishment. Goodwin also makes an eighth claim that the prosecutor's closing argument was improper.

## V) Analysis of Goodwin's claims

### A) Mental retardation

Goodwin's first claim states:

The motion court clearly erred in denying [Goodwin]'s postconviction motion based on evidence that he was mentally retarded, because the ruling violated his rights to due process, a jury trial, effective assistance of counsel, and freedom from cruel and unusual punishment, . . . in that Dr. Keyes testified that [Goodwin] was mentally retarded with IQ scores of 67–74, low adaptive skills, and an onset before age 18; Dr. Keyes was the only expert that assessed Paul's adaptive skills; a 1980 IQ score when [Goodwin] was a teenager was 72, within the mentally retarded range and other scores on verbal testing were 69; a kindergarten teacher referred [Goodwin] to the Special School District because she believed he was mentally retarded; and [Goodwin] failed third and fourth grades.

### 1. Claim refuted by the record

 This is the major issue presented in this post-conviction proceeding: whether or not Goodwin is retarded. The United States Supreme Court held in *Atkins v. Virginia*, that a retarded person, as defined by state law, cannot be executed for murder. 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). This is because retarded persons are categorically less culpable than the average criminal. *Id.* at 316, 122 S.Ct. 2242.

As a preliminary matter, Goodwin was not entitled to a hearing on this issue because his claim of mental retardation is conclusively refuted by the record of the trial. *Morrow v. State*, 21 S.W.3d 819, 822

(Mo. banc 2000). "An evidentiary hearing is not required if the motion court determines that the motion and the files and records of the case conclusively show that the movant is entitled to no relief. Rule 29.15(g)." *State v. Blankenship*, 830 S.W.2d 1, 16 (Mo. banc 1992).

The trial record includes the testimony of three expert witnesses. Of the experts, Dr. Rosalyn Schultz and Dr. Richard Wetzel are both psychologists and Dr. John Rabun is a psychiatrist. These experts testified that Goodwin was not retarded, but that he suffered from other conditions, which undercut his responsibility for the murder.

Dr. Rosalyn Schultz was retained on behalf of Goodwin.[1] Dr. Schultz extensively interviewed Goodwin, his family, and his social worker. Dr. Schultz evaluated Goodwin for eleven and a half hours before trial. She conducted personality testing, competency assessments, intelligence tests, achievement tests, malingering tests, psychological tests, and a personal history. On direct examination, she testified: "He also has intellectual impairments, a lower level of IQ, not in the retarded range, and so he—didn't achieve very well. He wasn't getting along with his peers." Dr. Schultz reviewed and testified about Goodwin's school records from the special school district. Regarding these records, she stated: "Consistently on the IQ tests, his verbal IQ, his full scale IQ, was in the borderline range, meaning *not as low as*

*mildly retarded but not up in the normal range,* and there's an indication of a learning disability that shows up on testing."

Dr. Schultz discussed Goodwin's hearing impairment, his employment history, his relationship with his family, his relationship with his fiancé, a few of his writings found in his fiancé's journal, his daily life, his account of the murder, and the results of his testing. Dr. Schultz testified that she administered the Wechsler Adult Intelligence Scale III to Goodwin. The results indicated a verbal IQ of 73, a performance IQ of 92, and a resultant full IQ of 80. On the Wide Range Achievement Test, Goodwin demonstrated an eighth-grade reading level, fifth-grade spelling level, and a fourth-grade arithmetic level. Dr. Schultz concluded that Goodwin suffered from major depression, a personality disorder, borderline intellectual functioning, and learning disorders. Dr. Schultz opined that Goodwin was not responsible for his conduct.

Dr. John Rabun, testified next.[2] Dr. Rabun spent five hours with Goodwin, interviewed Goodwin's mother, reviewed the materials submitted by Dr. Schultz and Dr. Wetzel, and examined Goodwin's records from the special school district. He testified: "Well, those scores, as they're listed there, in particular the ones under the category FS, which means full size or your total IQ, those are—those are all within the—well, *the first three are all*

---

1. Dr. Schultz has been licensed as a psychologist since 1979. She has experience as a special education teacher, worked as a learning disability specialist, and was an assistant professor at Webster University, St. Louis University, St. Louis University Medical School, and Washington University. She received her master's degree in education from Washington University in 1972. She then received a Ph.D. in psychology from St. Louis University. She was certified as a forensic examiner by the American College of Forensic Examiners in 1994 and is a Fellow in the American College of Forensic Examiners. She is also a Diplomat in the American Board of Psychological Specialties.

2. Dr. Rabun is a supervising psychiatrist at St. Louis State Hospital. He graduated from the University of Tennessee Medical School in 1987. He completed residency at Washington University in 1991. He is certified in both general and forensic psychiatry.

*within the borderline range. The fourth one is—is actually average."*

Dr. Rabun testified that the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition characterizes borderline IQ as between 71 and 86. He testified that borderline IQ indicates: "They're not all mentally retarded. It's a category different than mental retardation. They have some specific problems. They might not be as bright as the average individual, but they're able to function, work, take care of themselves, bathe themselves, communicate, live independently, unlike the mentally retarded." Dr. Rabun indicated that Goodwin had a history of learning disabilities. Dr. Rabun concluded that all of the IQ tests administered to Goodwin placed him in the borderline range of intelligence with the exception of the Nelson Adult Reading Test, which placed him in the average range of intelligence.

Dr. Rabun testified that Goodwin had no problems with adaptive functioning, "meaning his ability to bathe and clothe himself, communicate his desires, feed himself, drive, [and] work." Dr. Rabun testified that Goodwin was able to give directions to his home, recalled details of the murder and his actions, retained extensive knowledge of narcotics, recalled his use of alcohol, recalled giving CPR to his girlfriend and calling 911 on multiple occasions, and remembered living alone after the death of his girlfriend.

Dr. Wetzel was the final expert to testify.[3] Dr. Wetzel spent two days conducting psychological and neuropyschological tests on Goodwin in 1999. He conducted an MRI of Goodwin's brain, interviewed members of Goodwin's family, reviewed the reports of Dr. Rabun and Dr. Schultz, re-

viewed Goodwin's special school district records, reviewed Goodwin's records from St. Louis University, and reviewed the evidence and reports concerning the murder. Dr. Wetzel also testified that Goodwin was of borderline intellectual functioning. He testified:

That simply means that his IQs are average, between 70 and 79. There's mental retardation, and if you say somebody's borderline you're not saying they are borderline retarded. You're saying they're not mentally retarded. *He's not mentally retarded.*

Above that is average and low average. And what I'm saying is my best estimate is that he's not low average.

In his case the verbal IQ is picking up something quite different than the performance IQ where the performance IQ shows that he's clearly low average or average. That's the things that you can do without saying anything. The performance tests are called performance because you can do something.

When it comes to being able to function when you don't have to talk and you don't have to communicate, [Goodwin] can function in the low average to average range.

When it comes to things that are dependent on understanding language and explaining things and communicating with people, he's down at either the very high end of where most mentally retarded people are put in or in the borderline range.

*But he's still not mentally retarded. He just has realistic problems in this.*

And the pattern of the—his IQ scores are very clear cut. It just shows as he

---

3. He is a professor of medical psychology and a professor of neurological surgery in the respective departments of psychiatry and neurological surgery of Washington University School of Medicine. He received a Ph.D. from St. Louis University in clinical psychology and has worked for Washington University since 1970.

was tested from year to year he was getting farther and farther behind verbally. He just couldn't learn as fast verbally as other people were and he just kept falling behind.

Dr. Wetzel testified that based upon Goodwin's borderline intellectual functioning, his learning disability, and his hearing impairment, Goodwin had the capacity to conform his conduct to the requirements of the law when he killed Mrs. Crotts, but that his ability to do so was substantially impaired.

Three highly qualified witnesses testified, at his trial, that Goodwin was not retarded. There was no evidence to the contrary. The evidence in the trial record refutes Goodwin's new claim that he is retarded, and he was not entitled to a hearing on this issue. Rule 29.15(j).[4]

### 2. Selection of experts

■■■■ Moreover, the selection of expert witnesses, at trial, is not a matter Goodwin can successfully challenge in a 29.15 proceeding.

"Generally, the selection of witnesses and the introduction of evidence are questions of trial strategy and virtually unchallengeable." *State v. Kenley*, 952 S.W.2d 250, 266 (Mo. banc 1997). "Defense counsel is not obligated to shop for an expert witness who might provide more favorable testimony." *Id.* at 268 (citing [*State v.*] *Taylor*, 929 S.W.2d [209] at 225 [ (Mo. banc 1996) ]; *State v. Mease*, 842 S.W.2d 98, 114 (Mo. banc 1992)).

*Taylor v. State*, 126 S.W.3d 755, 762 (Mo. banc 2004). Three experts testified that

Goodwin was severely depressed, suffered from personality disorders, was of borderline intelligence, but was not mentally retarded. Counsel was not required to find another expert. Counsel was not ineffective for failing to shop around for someone to testify that Goodwin was retarded.

The motion court did not clearly err in dismissing this claim. Goodwin did not present credible evidence at the motion hearing to support his claims of mental retardation and ineffective assistance of counsel for not presenting those claims.

### 3. Required showing of mental retardation

■■■ Even if Goodwin's claim had not been refuted by the record, he would still not be entitled to relief on this claim. In *Johnson v. State,* this Court held: "as a bright-line test that a defendant that can prove mental retardation by a preponderance of the evidence, as set out in section 565.030.6,[5] shall not be subject to the death penalty." 102 S.W.3d 535, 540 (Mo. banc 2003). Section 565.030.6 defines "mental retardation" as:

A condition involving substantial limitations in general functioning characterized by significantly subaverage intellectual functioning with continual extensive related deficits and limitations in two or more adaptive behaviors such as communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure and work, which conditions are manifested and documented before eighteen years of age.

and the need to accommodate the claims of a" defendant. *State ex rel. Nixon v. Jaynes,* 63 S.W.3d 210, 215 (Mo. banc 2001).

---

**4.** This issue may rise to the level of res judicata since the issue of Goodwin's possible mental retardation was argued so extensively at the trial stage. A balance must be "struck between the need for finality of judgments

**5.** All statutory references are to RSMo 2000.

### a. Significantly subaverage intellectual functioning

The first requirement for showing mental retardation is "significantly subaverage intellectual functioning." This requirement is taken nearly verbatim from the Diagnostic and Statistical Manual IV of the American Psychiatric Association (DSM–IV). Michael B. First, M.D., Diagnostic and Statistical Manual IV, Text Revision, Disorder Usually First Diagnosed in Infancy, Childhood, or Adolescence, Mental Retardation 41 (American Psychiatric Association 2000). It is defined in the DSM–IV as a diagnostic feature of mental retardation. *Id.* "*General Intellectual functioning* is defined by the intelligence quotient (IQ or IQ-equivalent) obtained by assessment with one or more of the standardized, individually administered intelligence tests. . . ." *Id.*

Goodwin's past IQ tests were as follows:

| Date | Age | Test | Scores |
|---|---|---|---|
| 12/21/73 | 7 years, 1 month | Wechsler Intelligence Scale for Children | Verbal 81 Performance 87 **Full 83** |
| 5/20/75 | 8 years, 6 months | Wechsler Intelligence Scale for Children | Verbal 82 Performance 87 **Full 84** |
| 4/21/76 | 9 years, 5 months | Wechsler Intelligence Scale for Children Revised | Verbal 72 Performance 85 **Full 76** |
| 4/27/78 | 11 years, 5 months | Wechsler Intelligence Scale for Children Revised | Verbal 77 Performance 80 **Full 76** |
| 5/13/80 | 13 years, 6 months | Wechsler Intelligence Scale for Children Revised | Verbal 69 Performance 80 **Full 72** |
| 5/26/83 | 16 years, 6 months | Wechsler Intelligence Scale for Children Revised | Verbal 69 Performance 91 **Full 78** |
| 8/11/98 | 31 years, 9 months | Wechsler Adult Intelligence Scale | Verbal 73 Performance 92 **Full 80** |
| 1/27/00 | 33 years, 1 month | Wechsler Adult Intelligence Scale | Verbal 81 Performance 90 **Full 84** |

None of the evidence indicates manifest and documented mental retardation.[6] In fact, Goodwin has eight independent intelligence tests spread over twenty years that indicated that Goodwin is not retarded. Only one of these tests is even arguably

---

6. Goodwin cannot show the motion court clearly erred in finding trial counsel effective. In the words of the motion court:

> Trial counsel had no reason to dispute the findings of the experts who were consulted prior to trial as well as the litany of prior experts who evaluated [Goodwin] during his lifetime. Counsel is not ineffective for failing to get a second psychiatric examination when the first examination did not find defendant to be suffering from a mental disease or defect. *Putney v. State*, 785 S.W.2d 562, 563 (Mo.App.1990). Nor can counsel be considered ineffective for not seeking out a third psychologist when the first two consulted agreed [Goodwin] suffered from depression, not mental retardation.

within a five-point margin of error attributed to the Wechsler scale, and it is inadequate to raise a triable issue of fact.[7] Goodwin cannot make the initial showing of "significantly subaverage intellectual functioning" as demonstrated by his IQ, which places him consistently in the mid-seventies to eighties. He is squarely of borderline intelligence as testified all of the experts at trial.

### b. Continual extensive related deficits and limitations in adaptive behavior

The second requirement outlined in section 565.030.6 is also taken from the DSM–IV. A defendant must demonstrate "continual extensive related deficits and limitations in two or more adaptive behaviors such as communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure and work...." Section 565.030.6. The DSM–IV defines adaptive functioning.

Adaptive functioning refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting. Adaptive functioning may be influenced by various factors, including education, motivation, personality characteristics, social and vocational opportunities, and the mental disorders and general medical conditions that may coexist with Mental Retardation.

DSM–IV at 42. Without evidence that Goodwin's intellectual functioning is "significantly subaverage," there is no need to move on to a discussion of his adaptive behaviors.[8] Without belaboring the point, it is clear from the record that Goodwin's inability to hear has affected his adaptation into society, but this is not enough to overcome the evidence that Goodwin's IQ places him of borderline intellectual functioning.

### c. Manifested and documented before eighteen years of age

Lastly, section 565.030.6 specifically requires that a defendant establish mental retardation that is "manifested and documented before eighteen years of age."

7. The Diagnostic and Statistical Manual, which the experts relied on during trial, indicates:

> Significantly subaverage intellectual functioning is defined as an IQ of about 70 or below (approximately 2 standard deviations below the mean). It should be noted that there is a measurement of error of approximately 5 points in assessing IQ, although this may vary from instrument to instrument (e.g., a Wechsler IQ of 70 is considered to represent a range of 65–75). Thus, it is possible to diagnose Mental Retardation in individuals with IQs between 70 and 75 who exhibit significant deficits in adaptive behavior. Conversely, Mental Retardation would not be diagnosed in an individual with an IQ lower than 70 if there are no significant deficits or impairments in adaptive functioning.

DSM–IV at 41.

8. The DSM–IV indicates that "[i]mpairments in adaptive functioning, rather than a low IQ, are usually the presenting symptoms in individuals with Mental Retardation," but that "[p]roblems in adaptation are more likely to improve with remedial efforts than is cognitive IQ, which tends to remain a more stable attribute." The manual indicates that scales such as the Vineland Adaptive Behavioral Scales and the American Association on Mental Retardation Adaptive Behavior Scale may be used "to provide a clinical cutoff score that is a composite of performance in a number of adaptive skill domains." However the manual also cautions that "individual domain scores may vary considerably in reliability" and "the [p]resence of significant handicaps invalidates many adaptive scale norms." DSM–IV at 42.

This requirement is also taken from the DSM–IV, which lists mental retardation as a "Disorder Usually First Diagnosed in Infancy, Childhood, or Adolescence," and requires for diagnosis, that the "onset is before age 18 years." DSM–IV, Sec. 319 at 49. *All of Goodwin's testing, before age 18 and as discussed above, indicates that he was not retarded.*

The standard supplied in *Johnson v. State* was a "preponderance of the evidence." 102 S.W.3d at 540. Goodwin has not shown credible evidence of retardation, but only gives a claim unsupported by facts, rejected by the motion court, and wholly refuted by the record at the original trial and by the evidence introduced before the motion court below. The motion court did not clearly err in finding that Goodwin presented no documented evidence of retardation prior to age 18. Nor did the motion court clearly err in rejecting Goodwin's new 29.15 claim of retardation.

### 4. Dr. Keyes' testimony

Dr. Keyes, at the motion hearing, was the first person to testify that Goodwin was retarded. His testimony is insufficient to entitle Goodwin to any relief for three reasons.

First, his testimony results from his examination and diagnosis of Goodwin when he was 34 years old. He ignored that section 565.030.6 requires that mental retardation be "manifested and documented" by the age of 18.

Second, Dr. Keyes' testimony was found to be incredible by the motion court. The *motion court* held:

> **The Court, having heard and considered all of Dr. Keyes' testimony finds his opinions to lack the necessary evidence required to support his conclusions.** Dr. Keyes admitted that he based much of his opinions on his inter-

view with [Goodwin] as well as interviews with [Goodwin]'s family and friends. It is interesting to note that based upon these Vineland interviews, Dr. Keyes scored [Goodwin]'s ability to communicate at the level of a three (3) year old. Dr. Keyes acknowledged that the responders[,] to make [Goodwin] look at least three times as bad as his best estimate[,] exaggerated the Vineland's. This Court, having listened to [Goodwin]'s taped confession at trial finds Dr. Keyes' assertion to be unworthy of belief. Dr. Keyes admitted that his entire source of materials for his testimony were litigation materials chosen and provided to him by [Goodwin]'s counsel. Clearly, this testimony was biased toward the particular conclusion [Goodwin]'s counsel desired to reach.

Dr. Keyes conceded that many of the claims made by [Goodwin] in his interview were distorted, exaggerated, inconsistent and possibly untrue. Dr. Keyes admitted that [Goodwin], his family and friends have a strong incentive not to speak honestly about his past given his current position on death row.

. . . .

Dr. Keyes' testimony was wholly inconsistent with the previous experts hired on behalf of [Goodwin] before trial. His conclusions were unsupported by the independent records submitted or any credible evidence adduced. The only basis for his conclusions came from the limited materials [Goodwin]'s counsel chose to expose and the questionable intelligence testing he administered. **The only intelligence testing placing [Goodwin] in the range of mental retardation was that done by Dr. Keyes. His testimony cannot be considered reliable, as it is not based upon any objective evidence** . . . .

Third, Dr. Keyes is not a qualified expert. The motion court specifically held:

This Court rejects Dr. Keyes' testimony and status as an expert witness.

. . . .

The Court finds the testing of [Goodwin] completed by Dr. Keyes to be unreliable. Dr. Keyes had never been trained to evaluate the IQ of a hearing impaired individual. His intelligence testing of the thirty-four year old [Goodwin] contradicted all other IQ results obtained previously. His use of the Stanford–Binet was inappropriate without taking [Goodwin]'s hearing impairment into consideration. His rejection of the Wechsler based upon [Goodwin]'s unsubstantiated claims was unreasonable. Dr. Keyes denunciation of the Special School District records as being unreliable due to their desire to avoid attaching the "stigma" of a mental retardation level on [Goodwin] is refuted by the records and testimony of Dr. Marilyn Lamb. His failure to test for malingering and depression was below professional requirements for a thorough evaluation. It is unclear to this Court whether an educational psychologist is qualified to complete such testing. The use of the Vineland Scales to utilize hindsight in recalling [Goodwin]'s capabilities seventeen years prior was inaccurate even by Dr. Keyes' own testimony. The exaggerations by [Goodwin]'s family and friends in completing the Vineland Scales cause them to be of questionable value. [Goodwin]'s writings, drawings, recent work history, ability to live alone, and the Special School District records reflect adaptive skills far beyond those described by his witnesses.

Dr. Keyes is not certified or licensed as a psychologist or psychiatrist. Dr. Keyes administered a verbally based IQ test to a hearing impaired person, without a hearing aid, and offered it as evidence that he was retarded. Dr. Keyes also failed to test for malingering or depression as the other experts did.

Goodwin has not shown that the motion court clearly erred in rejecting Dr. Keyes' testimony or Goodwin's claim of retardation. Goodwin did not provide any credible evidence to the motion court to meet his burden to show mental retardation by a preponderance of the evidence. Dr. Keyes' testimony certainly does not demonstrate clear motion court error, especially when compared with the expert testimony regarding Goodwin's intelligence presented at trial. As discussed above, there was ample evidence in the record to support the trial court's conclusion.

Goodwin has presented no evidence that he has "significantly subaverage intellectual functioning with continual extensive related deficits and limitations in two or more adaptive behaviors . . . manifested and documented before eighteen years of age." Section 565.030.6. The motion court did not clearly err, but instead gave a thoughtful and detailed explanation, supported by the evidence, for each of its findings.[9] This point is denied.

**B) State's evidence of motive**

 Goodwin's second claim states: The motion court clearly erred in denying a hearing on the claim that [Goodwin's] counsel was ineffective for failing to investigate and present evidence to rebut the state's suggestion that [Goodwin] blamed Ms. Crotts for being evicted from the boarding house and killed her as a result, because this denied [Good-

9. Goodwin may pursue relief under section 552.060.

win] due process, effective assistance of counsel, and subjected him to cruel and unusual punishment, . . . in that the motion alleged facts, not conclusions, that entitled [Goodwin] to relief, that counsel acted unreasonably in failing to investigate and present documentary evidence, cancelled checks, and witnesses, Royal Crase, Mary Elaine Goodwin, Andy Silkwood, and Ray Dickerson, who would have established that [Goodwin] was not evicted from the boarding house in August 1996 because of fights with Ms. Crotts, rather he lived there until November, 1996; Ms. Crotts never complained about [Goodwin] to Mr. Crase, the owner of the boarding house; and when [Goodwin] moved from Mr. Crase's residence, he did not threaten Ms. Crotts.

At trial, the prosecutor talked about a grudge that Goodwin had against Mrs. Crotts based upon their interactions while Goodwin was living next door. As part of this motive, the prosecutor presented evidence that Goodwin was evicted because of his altercations with Mrs. Crotts. Goodwin claims that counsel was ineffective for not investigating or challenging the actual time and reason that Goodwin moved out. The motion court denied a hearing on this point. It held:

> The proposed testimony cited in the 29.15 motion would not have provided [Goodwin] with a defense to the violent murder of the victim. The Court's review of the proposed testimony indicates that if such testimony had been offered it would have been based upon hearsay, speculation and opinion as to [Goodwin's] thoughts or motives. As this testimony would have been inadmissible and does not provide a defense, trial counsel cannot be found to be ineffective for failing to call these witnesses.

. . . .

As noted above, the Court's review of the proposed testimony indicates that if such testimony had been offered it would have been based upon hearsay, speculation and opinion as to [Goodwin's] thoughts or motives. As this testimony would have been inadmissible and does not provide a defense, trial counsel cannot be found to be ineffective for failing to call these witnesses.

The motion court did not clearly err. These witnesses would have testified that Goodwin was not evicted in August, but instead later in November. They would have testified that Mrs. Crotts did not complain to the boarding house and that Goodwin did not have an altercation with Mrs. Crotts in October or November. The testimony does not contradict the State's evidence or theory that Goodwin held a grudge against Mrs. Crotts based on altercations with her during the time he lived at the boarding house and especially based upon the altercation in August. It only shows that he may not have actually been evicted in August.

The trial court did not clearly err when it held that it would be speculation for these witnesses to testify that Goodwin did not hold a grudge against Mrs. Crotts based on evidence that Goodwin's rent was paid through October, that he was not evicted in August, or that they helped him move out in October. Even if it is true that he was not evicted in August, Goodwin has not offered evidence to rebut the prosecutor's argument that he held a grudge against Mrs. Crotts because of his prior altercations with her or that such rebuttal would impact the validity of his penalty phase.

Goodwin is not entitled to any relief from his conviction, based upon this evidence, for killing her. He has not "cite[d] facts, not conclusions, which, if true, would entitle [Goodwin] to relief" or show that he

was prejudiced by not having this evidence presented. *State v. Blankenship*, 830 S.W.2d 1, 16 (Mo. banc 1992). Goodwin was not entitled to a hearing, and no prejudice exists because the timing of Goodwin's eviction would not provide a viable defense to Goodwin for killing Mrs. Crotts. This point is denied.

### C) Counsel's failure to investigate allegation that Goodwin threatened Mrs. Crotts

 Goodwin's third claim states:

The motion court clearly erred in denying a hearing on the claim that [Goodwin's] counsel was ineffective for failing to investigate and present evidence to rebut the state's suggestion that [Goodwin] threatened Ms. Cotts, while he smashed a rock with a sledgehammer, because this denied [Goodwin] due process, effective assistance of counsel, and subjected him to cruel and unusual punishment, ... in that the motion alleged facts, not conclusions, that entitled [Goodwin] to relief, that counsel acted unreasonably in failing to investigate and call Ronald Krabbenhoft who was present during the sledgehammer incident and disputed Hall's contention that [Goodwin] smashed a rock or threatened Mrs. Crotts.

The prosecutor presented evidence, through the testimony of James Hall, that while Goodwin was living next door to Mrs. Crotts, he threatened her by smashing a rock with a sledgehammer while saying: "this is your head ... if you keep messing with me." Goodwin claims that counsel was ineffective for not investigating or calling Ronald Krabbenhoft to testify that Goodwin made no such threat. The motion court dismissed this claim without a hearing. It held:

This witness was presented for this Court's consideration at the hearing held

on [Goodwin's] new trial motion. At that time the Court rejected his testimony as not credible. The record reflects that this witness, a felon, convicted of multiple offenses including child molestation, testified that [Goodwin] could be a very violent person when intoxicated, that he was scared of [Goodwin] and that he witnessed [Goodwin] harass the victim in the past. The Court notes that this testimony would have been inconsistent with the proposed testimony of [Royal Crase, Mary Elaine Goodwin, Andy Silkwood, and Ray Dickerson]. In addition the Missouri Supreme Court found that this testimony did not impeach the witness Hall and would have been cumulative in nature. *Goodwin*, 43 S.W.3d 805, 813 (Mo. banc 2001).

"In order to be entitled to an evidentiary hearing, a movant must 1) cite facts, not conclusions, which, if true, would entitle movant to relief; 2) the factual allegations must not be refuted by the record; and 3) the matters complained of must prejudice the movant." *State v. Blankenship*, 830 S.W.2d 1, 16 (Mo. banc 1992). This claim was raised in the form of a *Brady* violation on direct appeal. *Goodwin*, 43 S.W.3d 805, 813 (Mo. banc 2001). The Court rejected the claim. *Id.* The Court held:

Krabbenhoft's statement to the police does not impeach Hall's testimony. It is questionable that Krabbenhoft and Hall were speaking of the same event. Krabbenhoft was unsure of when he saw defendant "showing off" by pounding the ground with the sledgehammer. He indicated that there were many social gatherings held at the boardinghouse where the sledgehammer was accessible and he, Krabbenhoft, was absent. Krabbenhoft added that he owned the sledgehammer, which was always kept in the yard, and the residents of the

boardinghouse played with it occasionally.

*Id.* This was raised as part of Goodwin's prior appeal and cannot be relitigated, even on a different theory, during a post-conviction proceeding. *Mallett v. State,* 769 S.W.2d 77, 83 (Mo. banc 1989). This point is denied.

### D) Counsel's failure to investigate medical evidence

■ Goodwin's fourth claim states:

The motion court clearly erred in denying, without a hearing, [Goodwin's] claim that counsel was ineffective for failing to investigate the medical evidence, consult with and call a forensic pathologist, such as Dr. Thomas Bennett, because this denied [Goodwin] due process, effective assistance of counsel, and subjected him to cruel and unusual punishment, ... in that the motion pled facts, not conclusions that entitled [Goodwin] to relief: that counsel acted unreasonably in failing to investigate and present evidence concerning the pathology reports and physical evidence to show that Mrs. Crotts' injuries were consistent with a fall down the stairs and that she was not subjected to repeated and excessive physical abuse, a necessary finding for the aggravating circumstance of depravity of mind, and to rebut the State's suggestion that [Goodwin] beat her over her entire body and therefore, deliberated.

The prosecutor presented evidence that Goodwin beat Mrs. Crotts and, then, shoved her down the basement stairs. He broke eight of her ribs in the process. Goodwin then struck Mrs. Crotts, in the head, with a sledgehammer leaving two impressions in her skull. The expert at trial testified that she died from head injuries.

Goodwin claims that the pathology reports indicate that Mrs. Crotts died from her fall down the stairs. He claims that the reports do not suggest that he beat her extensively before shoving her down the stairs. Goodwin claims Dr. Bennett would have testified that: 1) many of Mrs. Crotts' injuries were more probably caused from the fall down the steps, including the bruising to the brain, 2) the victim did not die from head injuries, 3) hypertensive and atherosclerotic cardiovascular disease caused Mrs. Crotts' death, and 4) a microscopic examination would have indicated the age of her coronary artery thrombus, heart infarction, and brain bruises.

The motion court denied a hearing and held:

[Goodwin's] pleading does not contest the ultimate issue found by the medical examiner, Dr. Mary Case and the Missouri Supreme Court, "defendant's conduct proximately caused Mrs. Crotts death, and the precise cause of death has no bearing on his mental state at the time of striking his victim." *Goodwin,* 43 S.W.3d 805, 816 (Mo. banc 2001). As it was clear that the victim's injuries were caused by the deliberate acts of [Goodwin], whether by beating her or pushing her down the stairs, [Goodwin] could not have been prejudiced by trial counsel's failure to present this evidence.

The motion court did not clearly err when it denied Goodwin a hearing on Dr. Bennett's testimony. Dr. Bennett's testimony would not have refuted the jury finding that Goodwin killed Mrs. Crotts by beating her, shoving her down the stairs, and striking her head with a sledgehammer. It would only have reapportioned the amounts of damage done by each of Goodwin's actions and confirmed that she had some contributing health problems.

The issue before the court was deliberation. Dr. Bennett's testimony does not undercut the State's evidence that Goodwin beat Mrs. Crotts and hit her with a sledgehammer. His testimony only reapportions the actual cause of death from the beating to the shoving. This does not undercut the State's theory of deliberation or depravity.

Goodwin is not entitled to any relief from his conviction based upon Dr. Bennett's testimony. Goodwin has not "cite[d] facts, not conclusions, which, if true, would entitle [Goodwin] to relief" or show that he was prejudiced. *State v. Blankenship*, 830 S.W.2d 1, 16 (Mo. banc 1992). Even if it is true that Goodwin actually killed Mrs. Crotts by shoving her down the stairs instead of striking her head with a sledgehammer, he is not entitled to any relief from his conviction for deliberately killing her. Goodwin was not entitled to a hearing because the record, which includes Goodwin's confession and Mrs. Crotts' injuries, supports the jury's finding of depravity, regardless of which of her injuries actually caused her death. This point is denied.

### E) Counsel's failure to investigate Goodwin's mental state

■ Goodwin's fifth claim states:

The motion court clearly erred in denying a hearing on the claim that [Goodwin's] counsel was ineffective for failing to investigate and present evidence to rebut the state's suggestion that [Goodwin] planned to kill Mrs. Crotts and deliberated on the killing, because this denied [Goodwin] due process, effective assistance of counsel, right to present a defense, and subjected him to cruel and unusual punishment, ... in that the motion alleged facts, not conclusions, that entitled [Goodwin] to relief, that counsel acted unreasonably in failing to investi-

gate and present witnesses, Patty Higgins, Marilyn Lamb, Mary Welch, Mary Elaine Goodwin, Joseph Goodwin, Mary Mifflin, Kathleen Goodwin, Brenda Thomas, Jim Goodwin, Pat Goodwin, Dr. Meiners, Ray Dickerson, and Andy Silkwood, who would have testified: 1) that [Goodwin] was not capable of detailed planning due to his intellectual deficits, his inability to foresee consequences and his impulsive nature; 2) [Goodwin] was easily confused, got lost and wandered into strangers' houses when he was a child; and 3) [Goodwin] had legitimate reasons for walking on Hanley road, since he lived in the neighborhood and did not drive a car.

The prosecutor argued, at trial, that Goodwin had plenty of time in Mrs. Crotts' home to deliberate and that he had spent a year and a half planning this murder. During the guilt phase of his trial, Goodwin called Dr. Schultz, who testified that Goodwin could not appreciate the nature, quality, and wrongfulness of his conduct or deliberate.

Goodwin's claim is, essentially, that counsel was ineffective for not presenting more evidence to show that Goodwin lacked the capacity to deliberate. The motion court denied this claim without a hearing. It stated:

[T]he Court's review of the proposed testimony indicates that if such testimony had been offered it would have been based upon hearsay, speculation and opinion as to [Goodwin's] thoughts or motives. As this testimony would have been inadmissible and does not provide a defense, trial counsel cannot be found to be ineffective for failing to call these witnesses. In addition, [Goodwin's] experts testified at trial concerning his mental capabilities and his abilities to form the present intent. Much of what [Goodwin] suggests would have been

shown by the additional witnesses offered in these points is cumulative to evidence adduced at trial and at times conflicting with the mental health evidence offered by his experts.

. . . .

The proposed testimony of [Goodwin's] mother and sister is based upon hearsay, personal opinion, and speculation, which would have been ruled irrelevant had it been offered at trial. The subject of [Goodwin's] walking in the area was discussed by several witnesses including his expert. References to [Goodwin] walking towards home were offered by witnesses to serve as an additional basis of their identification of him. As [Goodwin's] proposed testimony would have been inadmissible and does not provide a defense, trial counsel cannot be found ineffective for failing to call these witnesses.

Goodwin was not entitled to a hearing on this testimony. "In order to be entitled to an evidentiary hearing, a movant must 1) cite facts, not conclusions, which, if true, would entitle movant to relief; 2) the factual allegations must not be refuted by the record; and 3) the matters complained of must prejudice the movant." *State v. Blankenship*, 830 S.W.2d 1, 16 (Mo. banc 1992). The factual allegations in Goodwin's 29.15 motion were that Goodwin could not form the required mental state because he was easily confused, could not foresee consequences, and, as a child, had wandered into strangers' houses.

The motion court did not clearly err. These witnesses could not have testified to what Goodwin was thinking at the time of the murder. The motion court also correctly held that this evidence was presented through Goodwin's expert at trial. Dr. Schultz testified that Goodwin was easily confused and could not foresee consequences. Dr. Schultz evaluated Goodwin

for eleven and a half hours before trial. She conducted personality testing, competency assessments, intelligence tests, achievement tests, malingering tests, psychological tests, and a personal history. Dr. Schultz reviewed and testified about Goodwin's school records from the Special School District. Dr. Schultz discussed Goodwin's hearing impairment, his employment history, his relationship with his family, his account of the murder, and the results of his testing. Dr. Schultz concluded that Goodwin suffered from major depression, a personality disorder, borderline intellectual functioning, and learning disorders. Dr. Schultz presented Goodwin's argument that he was not responsible for his conduct because he could not deliberate or foresee the consequences of his actions.

The witnesses above would have testified to the same issue about which Dr. Schultz testified. The purpose of their testimonies would have been to show that Goodwin could not deliberate and that it was coincidental that he had been seen on Hanley road. Their testimonies would have been cumulative, and Goodwin provides no additional facts that would exculpate Goodwin. Counsel was not "ineffective for not putting on cumulative evidence" from these other witnesses. *Skillicorn v. State*, 22 S.W.3d 678, 683 (Mo. banc 2000), *cert. denied*, 531 U.S. 1039, 121 S.Ct. 630, 148 L.Ed.2d 538 (2000). This point is denied.

### F) Counsel's inconsistent theories

Goodwin's sixth claim states:

The motion court clearly erred in denying a hearing on [Goodwin's] claims that counsel was ineffective for failing to adequately investigate his background and in presenting inconsistent theories in guilt and penalty phases, because this denied [Goodwin] due process, effective assistance of counsel, and subjected him

to cruel and unusual punishment, ... in that the motion pled facts, not conclusions that entitled [Goodwin] to relief; that counsel acted unreasonably in failing to investigate and provide their experts with all relevant background material and counsel called a psychologist Dr. Schultz in guilt phase who claimed [Goodwin] suffered from a mental disease and defect and could not appreciate the wrongfulness of his actions, and then in penalty phase called Dr. Wetzel who disagreed, saying [Goodwin] had no mental disease or defect and could appreciate that his actions were wrong.

The motion court denied this claim without a hearing. It held:

> This Court has thoroughly reviewed reports filed by Dr. Rosalyn Schultz and Dr. Richard Wetzel as well as their extensive trial testimony. These records reflect a consistent diagnosis of [Goodwin] with depression and only a slight disagreement between the witnesses as to the severity of the depression. Dr. Schultz was of the opinion that the depression was to such a degree that [Goodwin] was not responsible for his actions. Dr. Wetzel agreed that [Goodwin] suffered from major depression but found him responsible for his actions. Dr. Wetzel was called to offer mitigation testimony to prove that because of his condition, [Goodwin's] ability to conform his conduct to the requirements of the law was impaired. Based upon Dr. Wetzel's testimony, the Court submitted several factors in mitigation of punishment. [Goodwin's] allegation that counsel failed to investigate and provide a complete social history is refuted by the record. Both Dr. Schultz and Dr. Wetzel indicated in their reports and testimony an extensive list of materials and witnesses they had considered. From their reports and testimony it is clear that they

each investigated a thorough social history of [Goodwin]. These doctors interviewed many of the witnesses called at the evidentiary hearing in this matter. The voluminous records presented at the evidentiary hearing were reviewed by these experts prior to trial. The trial record refutes [Goodwin's] claim that the extent of trial counsel's investigation in this case was unreasonable....

"In order to be entitled to an evidentiary hearing, a movant must 1) cite facts, not conclusions, which, if true, would entitle movant to relief; 2) the factual allegations must not be refuted by the record; and 3) the matters complained of must prejudice the movant." *State v. Blankenship*, 830 S.W.2d 1, 16 (Mo. banc 1992).

### 1. Inconsistent theories

■■■ Goodwin conceded that he killed Mrs. Crotts. During guilt phase, he relied on a defense of not guilty by reason of mental disease or defect. Dr. Schultz testified that as a result of this defect, Goodwin was not able to coolly reflect or deliberate. After Goodwin was convicted and during penalty phase, Dr. Wetzel testified that, although Goodwin could control his behavior, his ability to conform his conduct to the law was substantially impaired, which should be considered as a mitigating factor.

This is not a case of counsel arguing a " 'he didn't do it' defense and a 'he is sorry he did it' mitigation," which would be impermissible. *Florida v. Nixon*, 543 U.S. 175, 191–92, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004) (internal citations omitted). Goodwin conceded in the first trial that he killed Mrs. Crotts. The change in expert testimony after conviction was simply a retooling of his argument. The jury had just rejected Goodwin's argument that he was not responsible for the murder because of his mental state. It was not error

for counsel to then argue that, even though the jury found that his mental state was not sufficient to excuse him, it should still consider his mental state to mitigate his punishment. *Middleton v. State*, 80 S.W.3d 799, 806 (Mo. banc 2002). Goodwin has not shown that he is entitled to any relief because of counsel's argument or Dr. Wetzel's testimony for mitigation. This point is denied.

### 2. Failure to investigate

■ Goodwin argues that the experts should have consulted more people and material. The motion court held that "it is clear that [the experts] each investigated a thorough social history of [Goodwin]." Goodwin has not provided any new facts that should have been considered and that would entitle him to relief. Additionally, the record refutes Goodwin's claim that counsel failed to investigate the defenses used at both trials. As discussed in the previous point, Dr. Schultz consulted many witnesses and considered much evidence. Dr. Wetzel also considered "an extensive list of materials and witnesses."

"Courts will not draw factual inferences or implications in a Rule 29.15 motion from bare conclusions or from a prayer for relief." *Ringo v. State*, 120 S.W.3d 743, 746 (Mo. banc 2003). Goodwin has not shown that had these experts consulted or considered any additional evidence, he would be entitled to relief for killing Mrs. Crotts. This point is denied.

### G) Lethal injection

Goodwin's seventh claim states:

The motion court clearly erred in denying a hearing on the claim that lethal injection is unconstitutional, as applied in Missouri, because that ruling denied [Goodwin] his rights to due process and to be free from cruel and unusual punishment . . . . in that the motion alleged facts, not conclusions, that entitled him to relief; specifically, that Missouri's method of execution is flawed in that it causes unnecessary pain as evidenced by 11 other executions that encountered problems and resulted in prolonged and unnecessary pain and the problems will likely reoccur since the Missouri statute confers unlimited discretion to the Department of Corrections and the procedures and protocols do not include safeguards regarding the manner in which executions should occur, fail to establish minimum qualifications and expertise for personnel conducting executions, and do not provide criteria and standards for lethal injection procedures, but use drugs that cause unnecessary pain and suffering; the allegations were not refuted by the record . . . .

The motion court denied this claim without hearing. It stated: "The identical claim was considered and rejected without an evidentiary hearing in *Morrow v. State*, 21 S.W.3d 819, 828 (Mo. banc 2000)." The Court recently considered and rejected an identical claim in *Worthington v. State*, 166 S.W.3d 566 (Mo. banc 2005). This point is denied.

### H) Closing argument

■ Goodwin's final claim states:

The motion court plainly erred in denying postconviction relief because the record shows that the prosecutor's closing argument violated [Goodwin's] rights to due process, to be free from self-incrimination, a fair trial and prohibition against cruel and unusual punishment, . . . in that the prosecutor argued in the penalty phase closing that:

A. this was one of the worst cases in St. Louis County, and therefore, the prosecutor had decided [Goodwin] deserved death;

B. urged jurors to give death to send a message to the community and to protect the elderly from similar attacks;

C. jurors had a duty to give death;

D. jurors' family, friends and coworkers would disapprove of a verdict less than death;

E. jurors did not hear [Goodwin] say he was sorry for what he had done; and

F. defense counsel had fabricated the defense by paying Dr. Schultz for a favorable opinion.

This claim has never been raised before either in direct appeal, or in the amended motion for post-conviction relief, or during this post-conviction proceeding.

[T]his is an appeal of the post-conviction proceeding. Our standard of review here is whether the post-conviction court "clearly erred" in denying relief in the post-conviction proceeding. Since the issue was never raised in the post-conviction proceeding, error by that court, plain, clear or otherwise, is not discernible.

*White v. State,* 939 S.W.2d 887, 904 (Mo. banc 1997). This claim was not properly presented to the motion court and is denied.

### VI) No motion court error

This Court rejects all of Goodwin's points. "The question is whether, when all the mitigation evidence is added together, is there a reasonable probability that the outcome would have been different?" *Hutchison v. State,* 150 S.W.3d 292, 306 (Mo. banc 2004). The defendant "must show that, but for his counsels' ineffective performance, there is a reasonable probability that the jury would have concluded after balancing the aggravating and mitigating circumstances, death was not warranted." *Rousan v. State,* 48 S.W.3d 576, 582 (Mo. banc 2001). Simply put, there is no reasonable probability that had every single thing Goodwin complains about been otherwise, "the result of the proceeding would have been different." *Williams v. Taylor,* 529 U.S. 362, 391, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (internal citations omitted).

Paul Goodwin confessed to a brutal murder. He forced Joan Crotts, a woman in her sixties, to perform oral sex on him. Then he threw her down her basement stairs, hit her in the head with a sledgehammer, and left her to die. His fingerprints were found at the scene, and Mrs. Crotts' blood was found on his clothing. Goodwin left bootprints at the scene, and his hearing aid was found in the backyard. Goodwin's confession corroborated the details of the crime.

Goodwin's trial attorneys presented a substantial amount of evidence about his mental deficiencies. Expert witnesses, called on Goodwin's behalf, established that he was of borderline intelligence, but that he was not mentally retarded. It was argued that Goodwin was not mentally capable of committing first-degree murder and that his punishment should be mitigated. This was a reasonable strategy; it just did not work.

When all of the evidence is viewed together, there is no question that Goodwin's conviction and sentence resulted from the evidence presented to the jury and not as a result of any of the claims of error that Goodwin asserts here.

The motion court's findings are presumed to be correct. *Black v. State,* 151 S.W.3d 49, 54 (Mo. banc 2004). The motion court did not "clearly [err] in making its findings of fact and conclusions of law" regarding the claims raised by Goodwin. *Skillicorn v. State,* 22 S.W.3d 678, 681 (Mo. banc 2000), *cert. denied,* 531 U.S.

1039, 121 S.Ct. 630, 148 L.Ed.2d 538 (2000). This Court is not "left with the definite and firm impression that a mistake has been made." *Moss v. State,* 10 S.W.3d 508, 511 (Mo. banc 2000).

The judgment is affirmed.

LIMBAUGH, RUSSELL and WHITE, JJ., concur.

WOLFF, C.J., dissents in separate opinion filed.

STITH and TEITELMAN, JJ., concur in opinion of WOLFF, C.J.

MICHAEL A. WOLFF, Chief Justice, dissenting.

I would hold that Goodwin made a submissible case for mental retardation such that he is entitled to a jury trial on that issue. As the principal opinion notes, *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), makes it unconstitutional to subject a mentally retarded individual to the death penalty.

In *Johnson v. State,* 102 S.W.3d 535 (Mo. banc 2003), this Court ordered a new penalty phase trial to determine whether the offender was mentally retarded and, thus, whether a sentence of death would violate the constitutional standard recognized in *Atkins. Johnson* controls this case and, like Johnson, Goodwin should receive a new penalty phase trial. Like Johnson, Goodwin was tried, convicted, and sentenced to death. On direct appeal, his conviction and sentence were affirmed before the *Atkins* decision. *State v. Good-*

*win,* 43 S.W.3d 805 (Mo. banc 2001). In both cases, trial experts opined that the offender was not mentally retarded; in both cases there was evidence that supported and refuted that opinion. In each case, the motion court heard evidence of the offender's retardation and considered, as well, the testimony of trial experts that the offender was not retarded. This Court in *Johnson* held that this dispute is to be resolved in a new penalty phase trial—and not by the motion court judge—where there is a genuine dispute as to the ultimate fact of whether the offender is retarded. 102 S.W.3d at 541. Unless Goodwin waives his right to a jury trial, a jury should determine this issue. Mo. Const. art. I, sec. 18(a); sec. 565.006, RSMo 2000.

Usually a post-conviction proceeding under Rule 29.15 involves the question of whether the offender received effective assistance of counsel. Although Goodwin's arguments are couched as attacks on the adequacy of his trial counsel, and that is how the principal opinion analyzes the issue, this is not the only way to address the issue. Rule 29.15(a) broadly encompasses a claim that a "conviction or sentence imposed violates the constitution" or a claim that "the sentence imposed was in excess of the maximum sentence authorized by law."[1] *Johnson* relied upon these provisions of Rule 29.15(a) in applying *Atkins,* rather than focusing on whether trial counsel was ineffective. *Id.* at 537. Even though the principal opinion rejects the challenge to the adequacy of representa-

---

1. Rule 29.15(a) provides: "**Nature of Remedy—Rules of Civil Procedure Apply.** A person convicted of a felony after trial claiming that the conviction or sentence imposed violates the constitution or laws of this state or the constitution of the United States, including claims of ineffective assistance of trial and appellate counsel, that the court imposing the sentence was without jurisdiction to do so, or that the sentence imposed was in excess of the maximum sentence authorized by law may seek relief in the sentencing court pursuant to the provisions of this Rule 29.15. This Rule 29.15 provides the exclusive procedure by which such person may seek relief in the sentencing court for the claims enumerated. The procedure to be followed for motions filed pursuant to this Rule 29.15 is governed by the rules of civil procedure insofar as applicable."

tion, Goodwin's motion suffices to raise the constitutionality of his sentence. Goodwin does not have to meet the ineffective assistance of counsel test to prevail on his mental retardation claim. Rather, if he can demonstrate, by a preponderance of the evidence, that he is mentally retarded, then his death sentence is unconstitutional. *Id.* at 540.

The question for the motion court is whether there is evidence that, if believed, would cause the finder of fact in a penalty phase trial to find that Goodwin is mentally retarded. *Id.* at 541. Put another way, the question is whether Goodwin can make a submissible case of mental retardation. Even though there may be significant evidence to refute that claim, as there was in *Johnson,* the issues of credibility are for the jury, not for the motion court. The evidence Goodwin submitted in support of his Rule 29.15 claim meets this standard.

The principal opinion asserts that Goodwin did not provide documented evidence that he was retarded before age 18. The evidence presented at the Rule 29.15 hearing shows otherwise. Although, as detailed in the principal opinion, there was ample evidence that Goodwin was not retarded, there was also enough evidence that he was retarded to make a submissible case.

Goodwin's main witness at the Rule 29.15 hearing, where the sole issue was mental retardation, was Dr. Denis Keyes, an educational psychologist. Dr. Keyes specializes in mental retardation and death penalty issues, and his research was cited by the Supreme Court in *Atkins.* 536 U.S. at 316 n. 20, 122 S.Ct. 2242.

Goodwin presented expert testimony that he is mentally retarded, with I.Q. scores of 67–74 and low adaptive skills during childhood. A 1980 I.Q. score, when Goodwin was a teenager, was 72, within the mentally retarded range, and he scored 69 on earlier verbal portions of the test. Moreover, a kindergarten teacher apparently believed that Goodwin was retarded, and he failed third and fourth grade. Goodwin was placed in a special high school program and never received the credits required to graduate from the regular high school. Witnesses testified that Goodwin exhibited serious adaptive problems as a child. None of the experts who opined that Goodwin was not retarded conducted any adaptive functioning tests. Dr. Keyes, who was the only expert to testify that Goodwin was retarded, was also apparently the only expert to review Goodwin's adaptive skills, an essential part of a mental retardation diagnosis.

Dr. Keyes' professional opinion is that Goodwin is "within the mild range of mental retardation, probably smack in the middle of it [with an] I.Q. around sixty-three, sixty-five." Although Dr. Keyes is the first professional to diagnose Goodwin with mental retardation, he believes that the other experts did not consider Goodwin's poor adaptive skills because they were not considering a mental retardation diagnosis.

The Missouri statute, section 565.030.6, RSMo Supp.2004, does not have an I.Q. cut-off or refer to any I.Q. component in the definition of "mental retardation." Experts, however, use various I.Q. tests as part of the assessment of mental retardation. The experts at trial agreed that, with the five-point margin of error, I.Q. scores of up to 75 could be considered within the mentally retarded range. Goodwin had verbal and total scores within this range.

As noted, *Johnson,* 102 S.W.3d 535, is similar and on point. In both cases, there was evidence at trial that the defendant was not mentally retarded. Johnson's experts testified that he was in the "low average" or "dull normal" range. *Id.* at

538–39. One expert, who believed Johnson was mentally retarded, was known to the defense but was not called to testify. *Id.* Likewise, the evidence at Goodwin's trial was mixed; although his experts testified that he was not mentally retarded, there was some evidence that could support a finding that he was. In both cases, there was considerable contrary evidence available to the motion court, so that "reasonable minds could differ as to movant's mental abilities." 102 S.W.3d at 540.

The role of the motion court in a case such as this is not to make the factual determination itself, as the judge did in this case. Where there is a real dispute as to the evidence, the proper remedy is to vacate the judgment and set the matter for a new trial in the penalty phase, as this Court did in *Johnson. Id.* at 541. The motion court in this case perceived its job as determining whether or not Goodwin is mentally retarded. However, once the threshold of a submissible case is established, that determination is to be made in a new penalty phase trial, by a jury, unless a jury is waived.

The principal opinion credits the motion court's determination that Dr. Keyes' testimony "lack[ed] the necessary evidence required to support his conclusions." The motion court rejected Dr. Keyes as an expert and as a witness. The motion court found Dr. Keyes' testing of Goodwin to be unreliable because he is not a licensed psychologist and because he relied on adaptive skills information provided by Goodwin's family.

The considerations that caused the motion court to reject Dr. Keyes' testimony do not negate his status as an expert witness, nor do they make his expert testimony inadmissible. All of the factors recited by the motion court go to the weight of the testimony, not to its admissibility. Resolution of disputes in the evidence, and evaluation of the credibility of an expert witness, is for the jury, not the motion court. *See, e.g., Georgescu v. K Mart Corp.,* 813 S.W.2d 298, 299 (Mo. banc 1991). The principal opinion recognizes that credibility is normally for the jury but here thinks that the judge found the expert so unworthy of belief that it could make an exception. Exceptions should not be made, or we run the risk of the exception becoming the rule.

The principal opinion notes that Dr. Keyes' adaptive functioning testimony is inappropriate because it was conducted when Goodwin was over 30 years old. However, the interviews were specifically designed to elicit information about Goodwin as a child. This holding by the principal opinion amounts to a determination that a person can never be found to be retarded if the necessary adaptive testing and documentation were not done before age 18, or if documentation for some reason cannot be retrieved. This interpretation of the statute does not satisfy the constitutional standard set forth in *Atkins* because it could allow a mentally retarded person to be executed.

The only question for the motion court at a Rule 29.15 evidentiary hearing is whether there is, in effect, a submissible case that the movant is mentally retarded. Goodwin presents such a case, and he should receive a new penalty phase jury trial on that issue.